Tracy S. Thorleifson (WA State Bar #16633)
Sophie H. Calderón (CA State Bar #278135)
Krista K. Bush (WA State Bar #30881)
Connor Shively (WA State Bar #44043)
Attorneys
Federal Trade Commission
915 2nd Ave., Suite 2896
Seattle, WA  98174
Email: tthorleifson@ftc.gov
       scalderon@ftc.gov
       kbush@ftc.gov
       cshively@ftc.gov
Telephone: (206) 220-6350
Attorneys for Plaintiff Federal Trade Commission

Elizabeth K. Korsmo (NM State Bar #8989)
Assistant Attorney General
Office of Attorney General Hector Balderas
408 Galisteo St.
Santa Fe, NM  87501
Email: ekorsmo@nmag.gov
Telephone: (505) 827-6000
Attorney for Plaintiff State of New Mexico

Kyle Beckman (AL State Bar #ASB-6046-E63B)
Assistant Attorney General
Office of Attorney General Luther Strange
501 Washington Ave.
Montgomery, AL  36104-0152
Email: kbeckman@ago.state.al.us
Telephone: (334) 353-2619
Attorney for Plaintiff State of Alabama

Cynthia C. Drinkwater (AK State Bar #8808159)
Assistant Attorney General
Office of Attorney General Craig W. Richards
1031 W. 4th Ave., Suite 200
Anchorage, AK  99501
Email: cynthia.drinkwater@alaska.gov
Telephone: (907) 269-5200
Attorney for Plaintiff State of Alaska

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

JUN 0 4 2015

CHRIS R. JOHNSON, Clerk
By
_____
Deputy Clerk

5:15-mc-34

FTC, 50 States, and D.C. v. Cancer Fund of America, Inc., et al.
Complaint, Page 1 of 148

Nancy Vottero Anger (AZ State Bar #006810)
Matthew du Mee (AZ State Bar #028468)
Assistant Attorneys General
Office of Attorney General Mark Brnovich
1275 W. Washington
Phoenix, AZ  85007
Email: nancy.anger@azag.gov
        matthew.dumee@azag.gov
Telephone:   (602) 542-7710 (Anger)
               (602) 542-7731 (DuMee)
Attorneys for Plaintiff State of Arizona

Kevin Wells (AR State Bar #2007-213)
Assistant Attorney General
Office of Attorney General Leslie Rutledge
323 Center St., Suite 500
Little Rock, AR  72201
Email: kevin.wells@arkansasag.gov
Telephone: (501) 682-8063
Attorney for Plaintiff State of Arkansas

Sonja K. Berndt (CA State Bar #131358)
Deputy Attorney General
Office of Attorney General Kamala D. Harris
300 S. Spring St., Suite 1702
Los Angeles, CA  90013
Email: sonja.berndt@doj.ca.gov
Telephone: (213) 897-2179
Attorney for Plaintiff State of California

Alissa Hecht Gardenswartz (CO State Bar #36126)
First Assistant Attorney General
John Feeney-Coyle (CO State Bar #44970)
Assistant Attorney General
Office of Attorney General Cynthia H. Coffman
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, CO  80203
Email: alissa.gardenswartz@state.co.us
        john.feeney-coyle@state.co.us
Telephone:   (720) 508-6204 (Gardenswartz)
               (720) 508-6232 (Feeney-Coyle)
Attorneys for Plaintiff State of Colorado

1  LeeAnn Morrill (CO Bar #38742)
   First Assistant Attorney General
2  Public Officials Unit
3  Office of Attorney General Cynthia H. Coffman
   Ralph L. Carr Colorado Judicial Center
4  1300 Broadway, 6th Floor
5  Denver, Colorado  80203
   Email:  leeann.morrill@state.co.us
6  Telephone:  (720) 508-6159
7  Attorney for Plaintiff Secretary of State Wayne Williams

8  Gary W. Hawes (CT State Bar #415091)
   Assistant Attorney General
9  Office of Attorney General George Jepsen
10 55 Elm St., P.O. Box 120
   Hartford, CT  06141-0120
11 Email: gary.hawes@ct.gov
12 Telephone: (860) 808-5020
   Attorney for Plaintiff State of Connecticut
13

14 Gregory C. Strong (DE State Bar #4664)
   Director
15 Gillian L. Andrews (DE State Bar #5719)
16 Deputy Attorney General
   Office of the Attorney General Matthew P. Denn
17 Consumer Protection Unit
18 820 N. French Street, 5th Floor
   Wilmington, DE 19801
19 Email: gregory.strong@state.de.us
          gillian.andrews@state.de.us
20 Telephone:    (302) 577-8504 (Strong)
21                (302) 577-8844 (Andrews)
   Attorneys for Plaintiff State of Delaware
22

23 Brian R. Caldwell (DC Bar #979680)
   Assistant Attorney General
24 Office of Attorney General Karl A. Racine
25 441 Fourth St., NW, Suite 600-N
   Washington, DC  20001
26 Email: Brian.Caldwell@dc.gov
27 Telephone: (202) 727-6211
   Attorney for Plaintiff District of Columbia
28

Rebecca Sirkle (FL State Bar #42312)
Assistant Attorney General
Office of Attorney General Pam Bondi
135 W. Central Blvd., Suite 670
Orlando, FL  32801
Email: Rebecca.Sirkle@myfloridalegal.com
Telephone: (407) 316-4840
Attorney for Plaintiff State of Florida

Daniel Walsh (GA State Bar #735040)
Senior Assistant Attorney General
Office of Attorney General Sam Olens
Department of Law, State of Georgia
40 Capitol Square, SW
Atlanta, GA  30334-1300
Email: dwalsh@law.ga.gov
Telephone: (478) 207-1391
Attorney for Plaintiff State of Georgia and Georgia Secretary of State

Hugh R. Jones (HI State Bar #4783)
Supervising Deputy Attorney General
Jodi L. K. Yi (HI State Bar #6625)
Deputy Attorney General
Office of Attorney General Douglas S. Chin
425 Queen St.
Honolulu, HI  96813
Email: Hugh.R.Jones@Hawaii.gov
        Jodi.K.Yi@Hawaii.gov
Telephone: (808) 586-1470
Attorneys for Plaintiff State of Hawaii

Jane E. Hochberg (ID State Bar #5465)
Deputy Attorney General
Office of Attorney General Lawrence G. Wasden
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
Boise, ID  83720
Email: jane.hochberg@ag.idaho.gov
Telephone: (208) 334-2424
Attorney for Plaintiff State of Idaho

Therese M. Harris (IL State Bar #6190609)
Barry S. Goldberg (IL State Bar #6269821)
Assistant Attorneys General
Office of Attorney General Lisa Madigan
100 West Randolph St., 11th Floor
Chicago, IL  60601
Email: tharris@atg.state.il.us
         bgoldbrg@atg.state.il.us
Telephone: (312) 814-2595
Attorneys for Plaintiff State of Illinois

Richard M. Bramer (IN State Bar #15989-77)
Deputy Attorney General and Director, Consumer Protection Division
Office of Attorney General Gregory F. Zoeller
302 W. Washington St., 5th Floor
Indianapolis, IN  46204
Email:  richard.bramer@atg.in.gov
Telephone:  (317) 232-1008
Attorney for Plaintiff State of Indiana

Steve St. Clair (IA State Bar # AT 0007441)
Assistant Attorney General
Office of Attorney General Tom Miller
1305 E. Walnut, 2nd Floor
Des Moines, IA  50319
Email: steven.stclair@iowa.gov
Telephone: (515) 281-3731
Attorney for Plaintiff State of Iowa

Lynette R. Bakker (KS State Bar #22104)
Assistant Attorney General
Office of Attorney General Derek Schmidt
120 S.W. 10th Ave., 2nd Floor
Topeka, KS  66612
Email: lynette.bakker@ag.ks.gov
Telephone: (785) 296-3751
Attorney for Plaintiff State of Kansas

Leah Cooper Boggs (KY State Bar #83471)
John Ghaelian (KY State Bar #94987)
Assistant Attorneys General
Office of Attorney General Jack Conway
1024 Capital Center Drive

Frankfort, KY  40601
Email: John.Ghaelian2@ky.gov
        Leah.Boggs@ky.gov
Telephone: (502) 696-5389
Attorneys for Plaintiff Commonwealth of Kentucky
Cathryn E. Gits (LA State Bar #35144)

Assistant Attorney General
Office of Attorney General James D. "Buddy" Caldwell
1885 N. Third St.
Baton Rouge, LA  70802
Email: gitsc@ag.state.la.us
Telephone: (225) 326-6400
Attorney for Plaintiff State of Louisiana

Carolyn A. Silsby (ME Bar # 3030)
Assistant Attorney General
Office of Attorney General Janet T. Mills
Burton M. Cross Office Building, 111 Sewall St.
6 State House Station
Augusta, ME  04333
Email:  carolyn.silsby@maine.gov
Telephone: (207) 626-8829
Attorney for Plaintiff State of Maine

C. Beatrice Nuñez-Bellamy
Assistant Attorney General
Office of Attorney General Brian E. Frosh
200 St. Paul Place
Baltimore, MD  21202
Email: bnunezbellamy@oag.state.md.us
Telephone:  (410) 576-6300
Attorney for Plaintiffs State of Maryland and Secretary of State John Wobensmith

Brett J. Blank (MA State Bar #686635)
Assistant Attorney General
Non-Profit Organizations/Public Charities Division
Office of Attorney General Maura Healey
One Ashburton Place, 18th Floor
Boston, MA  02108
Email: brett.blank@state.ma.us
Telephone: (617) 727-2200
Attorney for Plaintiff Commonwealth of Massachusetts

William R. Bloomfield (MI State Bar #P68515)
Assistant Attorney General
Department of Attorney General Bill Schuette
Corporate Oversight Division
525 W. Ottawa St., 6th Floor
Lansing, MI  48933
Email: bloomfieldw@michigan.gov
Telephone: (517) 373-1160
Attorney for Plaintiff State of Michigan

Elizabeth B. Kremenak (MN Bar #0390461)
Assistant Attorney General
Office of Attorney General Lori Swanson
Bremer Tower, Suite 1200
445 Minnesota St.
St. Paul, MN  55101-2130
Email: elizabeth.kremenak@ag.state.mn.us
Telephone: (651) 757-1423
Attorney for Plaintiff State of Minnesota

Tanya Webber (MS State Bar #99405)
Assistant Secretary of State – Charities Division
Office of Secretary of State Delbert Hosemann
125 S. Congress St.
Jackson, MS  39201
Email: Tanya.webber@sos.ms.gov
Telephone: (601) 359-6742
Attorney for Plaintiff Secretary of State of Mississippi

Robert E. Carlson (MO State Bar #54602)
Senior Assistant Attorney General
Office of Attorney General Chris Koster
815 Olive St., Suite 200
St. Louis, MO  63101
Email: bob.carlson@ago.mo.gov
Telephone: (314) 340-6816
Attorney for Plaintiff State of Missouri

E. Edwin Eck (MT State Bar #414)
Deputy Attorney General
Kelley L. Hubbard (MT State Bar #9604)
Assistant Attorney General
Office of Attorney General Timothy C. Fox

1   P. O. Box 200151
    Helena, MT  59601
2   Email: EdEck@mt.gov
3          khubbard@mt.gov
    Telephone: (406) 444-2026
4   Attorneys for Plaintiff State of Montana

5
    Abigail M. Stempson (NE State Bar #23329)
6   Daniel J. Russell (NE State Bar #25302)
7   Assistant Attorneys General
    Office of Attorney General Douglas Peterson
8   2115 State Capitol
    PO Box 98920
9   Lincoln, NE  68509
10  Email: Abigail.stempson@nebraska.gov
           Daniel.russell@nebraska.gov
11  Telephone: (402) 471-1279
12  Attorneys for Plaintiff State of Nebraska

13  JoAnn Gibbs (NV State Bar # 005324)
14  Chief Multistate Counsel
    Office of Attorney General Adam Paul Laxalt
15  Bureau of Consumer Protection
16  10791 W. Twain Ave., Suite 100
    Las Vegas, NV  89135
17  Email: jgibbs@ag.nv.gov
18  Telephone: (702) 486-3789
    Attorney for Plaintiff State of Nevada
19
20  Thomas J. Donovan (NH State Bar #664)
    Director of Charitable Trusts
21  Office of Attorney General Joseph A. Foster
    33 Capitol St.
22  Concord, NH  03301
23  Email: tom.donovan@doj.nh.gov
    Telephone: (603) 271-1288
24  Attorney for Plaintiff State of New Hampshire
25
    Erin M. Greene (NJ State Bar #0145102010)
26  Deputy Attorney General
    State of New Jersey
27  Office of the Attorney General
28  Division of Law

124 Halsey St.
P.O. Box 45029
Newark, NJ 07101
Email: erin.greene@dol.lps.state.nj.us
Telephone: (973) 648-4846
Attorney for Plaintiff State of New Jersey


Sean Courtney (NY State Bar #2085363)
Yael Fuchs (NY State Bar # 4542684)
Assistant Attorneys General
Office of Attorney General Eric T. Schneiderman
120 Broadway
New York, NY 10271
Email: sean.courtney@ag.ny.gov
        yael.fuchs@ag.ny.gov
Telephone: (212) 416-8402
Attorneys for Plaintiff State of New York


Creecy Johnson (NC State Bar #32619)
Special Deputy Attorney General
Office of Attorney General Roy Cooper
9001 Mail Service Center
Raleigh, NC 27699
Email: ccjohnson@ncdoj.gov
Telephone: (919) 716-6000
Lareena J. Phillips (NC State Bar #36859)
Assistant Attorney General
Counsel for North Carolina Secretary of State Elaine F. Marshall
9001 Mail Service Center
Raleigh, NC 27699
Email: lphillips@ncdoj.gov
Telephone: (919) 716-6610
Attorneys for Plaintiff State of North Carolina


Michael C. Thompson (ND State Bar # 06550)
Assistant Attorney General
Office of Attorney General Wayne Stenehjem
Gateway Professional Center
1050 E. Interstate Ave., Ste. 200
Bismarck, ND 58503
Email: mcthompson@nd.gov
Telephone: (701) 328-5570
Attorney for Plaintiff State of North Dakota

Yvonne Tertel (OH State Bar #0019033)
Principal Assistant Attorney General
Office of Attorney General Mike DeWine
150 E. Gay St., 23rd Floor
Columbus, OH  43215
Email: yvonne.tertel@ohioattorneygeneral.gov
Telephone: (614) 466-3181
Attorney for Plaintiff State of Ohio

Malisa McPherson (OK State Bar #32070)
Assistant Attorney General
Public Protection Unit
Office of Attorney General E. Scott Pruitt
313 N.E. 21st St.
Oklahoma City, OK 73105
Email: Malisa.mcpherson@oag.ok.gov
Telephone: (405) 521-6926
Attorney for Plaintiff State of Oklahoma

Heather L. Weigler (OR State Bar #03590)
Assistant Attorney General
Office of Attorney General Ellen Rosenblum
1515 SW 5th Ave., Suite 410
Portland, OR  97201
Email: heather.l.weigler@state.or.us
Telephone: (971) 673-1880
Attorney for Plaintiff State of Oregon

Michael T. Foerster (PA State Bar #78766)
Senior Deputy Attorney General
Office of Attorney General Kathleen G. Kane
14th Floor Strawberry Square
Harrisburg, PA  17120
Email: mfoerster@attorneygeneral.gov
Telephone: (717) 783-2853
Gene J. Herne (PA State Bar #82033)
Senior Deputy Attorney General-in-Charge
Charitable Trusts and Organizations Section
Office of Attorney General Kathleen G. Kane
564 Forbes Avenue, 6th Floor Manor Complex
Pittsburgh, PA 15219

Email: eherne@attorneygeneral.gov
Telephone: (412) 565-3581
Attorneys for Plaintiff Commonwealth of Pennsylvania

Genevieve M. Martin (RI State Bar #3918)
Assistant Attorney General
Department of Attorney General Peter F. Kilmartin
150 South Main St.
Providence, RI  02903
Email: gmartin@riag.ri.gov
Telephone: (401) 274-4400 x2300
Attorney for Plaintiff State of Rhode Island

Shannon A. Wiley (SC State Bar #69806)
Deputy General Counsel
Office of Secretary of State Mark Hammond
1205 Pendleton St., Suite 525
Columbia, SC  29201
Email: swiley@sos.sc.gov
Telephone: (803) 734-0246
Attorney for Plaintiff State of South Carolina

Philip D. Carlson (SD State Bar #3913)
Assistant Attorney General
Office of Attorney General Marty J. Jackley
1302 E. Highway 14, Suite 1
Pierre, SD  57301
Email: Phil.Carlson@state.sd.us
Telephone: (605) 773-3215
Attorney for Plaintiff State of South Dakota

Janet M. Kleinfelter (TN State Bar # 13889)
Deputy Attorney General
Office of the Attorney General
425 5th Ave., N.
P.O. Box 20207
Nashville, TN  37202
Email: Janet.Kleinfelter@ag.tn.gov
Telephone: (615) 741-7403
Attorney for Plaintiff Tennessee Secretary of State Tre Hargett

Corey D. Kintzer (TX State Bar #24046219)
Jennifer M. Roscetti (TX State Bar #24066685)
Assistant Attorneys General
Office of Attorney General Ken Paxton
300 W. 15th St., 9th Floor
Austin, TX  78701
Email: Corey.Kintzer@texasattorneygeneral.gov
         Jennifer.Roscetti@texasattorneygeneral.gov
Telephone:    (512) 936-0585 (Kintzer)
                  (512) 475-4183 (Roscetti)
Attorneys for Plaintiff State of Texas

Jeffrey Buckner (UT State Bar #4546)
Assistant Attorney General
Office of Attorney General Sean D. Reyes
160 E. 300 South, Fifth Floor
P. O. Box 140872
Salt Lake City, UT  84114
Email: Jbuckner@utah.gov
Telephone: (801) 366-0310
Attorney for Plaintiff State of Utah and Utah Division of Consumer Protection

Todd W. Daloz (VT State Bar #4734)
Assistant Attorney General
Office of Attorney General William H. Sorrell
109 State St.
Montpelier, VT  05609
Email: todd.daloz@state.vt.us
Telephone: (802) 828-4605
Attorney for Plaintiff State of Vermont

Richard S. Schweiker, Jr. (VA State Bar #34258)
Senior Assistant Attorney General
Office of Attorney General Mark R. Herring
900 E. Main St.
Richmond, VA  23219
Email: rschweiker@oag.state.va.us
Telephone: (804) 786-5643
Attorney for Plaintiff Commonwealth of Virginia

Sarah A. Shifley (WA State Bar #39394)
Assistant Attorney General
Office of Attorney General Robert W. Ferguson

800 5th Ave., Suite 2000, TB-14
Seattle, WA  98104
Email: sarah.shifley@atg.wa.gov
Telephone: (206) 389-3974
Attorney for Plaintiff State of Washington

Michael M. Morrison (WV State Bar #9822)
Assistant Attorney General
Office of Attorney General Patrick Morrisey
P.O. Box 1789
Charleston, WV  25326
Email: Matt.M.Morrison@wvago.gov
Telephone: (304) 558-8986
Laurel K. Lackey (WV State Bar #10267)
Assistant Attorney General
Counsel for Secretary of State Natalie E. Tennant
269 Aikens Center
Martinsburg, WV  25404
Email: Laurel.K.Lackey@wvago.gov
Telephone: (304) 267-0239
Attorneys for Plaintiff State of West Virginia

Francis X. Sullivan (WI State Bar #1030932)
Assistant Attorney General
Office of Attorney General Brad D. Schimel
17 W. Main St., P.O. Box 7857
Madison, WI  53707-7857
Email: sullivanfx@doj.state.wi.us
Telephone: (608) 267-2222
Attorney for Plaintiff State of Wisconsin

Clyde W. Hutchins (WY State bar #6-3549)
Senior Assistant Attorney General
Office of Attorney General Peter K. Michael
123 State Capitol
Cheyenne, WY  82003
Email: clyde.hutchins@wyo.gov
Telephone: (307) 777-7847
Attorney for Plaintiff State of Wyoming

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Federal Trade Commission; and the States of Alabama; Alaska; Arizona; Arkansas; California; Colorado; Connecticut; Delaware; Florida; Georgia; Hawaii; Idaho; Illinois; Indiana; Iowa; Kansas; Kentucky; Louisiana; Maine; Maryland; Massachusetts; Michigan; Minnesota; Mississippi; Missouri; Montana; Nebraska; Nevada; New Hampshire; New Jersey; New Mexico; New York; North Carolina; North Dakota; Ohio; Oklahoma; Oregon; Pennsylvania; Rhode Island; South Carolina; South Dakota; Tennessee; Texas; Utah; Vermont; Virginia; Washington; West Virginia; Wisconsin; and Wyoming; and the District of Columbia; <br>           Plaintiffs; <br> vs. <br><br> Cancer Fund of America, Inc., also d/b/a Breast Cancer Financial Assistance Fund, a Delaware corporation; Cancer Support Services, Inc., a District of Columbia corporation; Children's Cancer Fund of America, Inc., an Arizona corporation; The Breast Cancer Society, Inc., also d/b/a The Breast Cancer Society of America, a Delaware corporation; James Reynolds, Sr., individually and in his capacity as an officer or director of Cancer Fund of America, Inc.; Kyle Effler, individually and in his capacities as an officer or director of Cancer Fund of America, Inc., and Cancer Support Services, Inc.; Rose Perkins, individually and in her capacity as an officer or director of Children's Cancer Fund of America, Inc.; and James Reynolds, II, a/k/a James Reynolds, Jr., individually and in his capacity as an officer or director of The Breast Cancer Society, Inc.; <br>           Defendants. | CASE NO. <br><br> **COMPLAINT** |

**COMPLAINT**

1      Plaintiffs, the Federal Trade Commission ("FTC") and the states of Alabama,

2 Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida,

3 Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine,

4 Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana,

5 Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North

6 Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South

7 Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West

8 Virginia, Wisconsin, and Wyoming, and the District of Columbia (collectively

9 "Plaintiffs"), for their complaint against Defendants Cancer Fund of America, Inc., also

10 d/b/a Breast Cancer Financial Assistance Fund ("CFA"); Cancer Support Services, Inc.

11 ("CSS"); Children's Cancer Fund of America, Inc. ("CCFOA"); The Breast Cancer

12 Society, Inc., also d/b/a The Breast Cancer Society of America ("BCS"); James

13 Reynolds, Sr.; Kyle Effler; Rose Perkins; and James Reynolds, II, a/k/a James Reynolds,

14 Jr. (collectively "Defendants") allege:

15 <u>**SUMMARY OF THE CASE**</u>

16      1.      Defendants, four sham charities and the individuals who run them, have

17 engaged in a massive, nationwide fraud, telling generous Americans that their

18 contributions will help people suffering from cancer, but instead, spending the

19 overwhelming majority of donated funds supporting the Individual Defendants, their

20 families and friends, and their fundraisers. Collectively, between 2008 and 2012,

21 Defendants raised more than $187 million from donors in the United States. This case is

22 about those sham charities, the individuals who ran them, and the false and deceptive

23 claims they made while raising these enormous sums from an unsuspecting public.

24      2.      In telemarketing calls, direct mail solicitations, websites, regulatory filings,

25 financial documents, and Combined Federal Campaign materials, Defendants have

26 portrayed themselves as legitimate charities with substantial nationwide programs whose

primary purposes were to provide direct support to cancer patients, children with cancer, and breast cancer patients in the United States. They also have described specific programs that donors' contributions supposedly would support, including, e.g., stating that donations would be used to provide pain medication to children suffering from cancer, transport cancer patients to chemotherapy appointments, or pay for hospice care for cancer patients. These were lies. Not one of the Defendants has operated a program that provides cancer patients with pain medication to alleviate their suffering, transports cancer patients to chemotherapy appointments, or pays for hospice care. Moreover, the vast majority of donors' contributions have not directly assisted cancer patients in the United States or otherwise benefitted any charitable purpose. Rather, donations have enriched a small group of individuals related by familial and financial interests and the for-profit fundraisers they hired. This diversion of charitable funds has deceived donors and wasted millions of dollars that could have been spent as donors intended, to help Americans suffering from cancer.

3.      Defendants have hidden their high fundraising and administrative costs from donors by using an accounting scheme involving the shipment of pharmaceuticals and other goods (known as gifts-in-kind or "GIK") to developing countries. Through this scheme, collectively from 2008 through 2012, Defendants improperly reported over $223 million in revenue and program spending in their financial statements. This had the effect of making Defendants appear to be larger and more efficient with donors' dollars than they actually were, deceiving the donating public.

4.      Defendants' deceptive conduct has violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, as well as state statutes regarding charitable solicitations and prohibiting deceptive and unfair trade practices.

5.      The FTC brings this action under Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary,

preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the TSR, 16 C.F.R. Part 310.

6.      This action is also brought, in their representative and individual capacities as provided by state law, by the attorneys general of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Texas, Utah,[1] Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming (collectively the "Attorneys General") and the secretaries of state of Colorado, Georgia, Maryland, North Carolina, South Carolina, Tennessee, Mississippi, and West Virginia (collectively the "Secretaries of State").  The plaintiffs identified in this paragraph are referred to collectively as the "Plaintiff States."

7.      The Plaintiff States bring this action pursuant to consumer protection, business regulation, charitable solicitation, and/or charitable trust enforcement authority conferred on their attorneys general, secretaries of state, and/or state agencies by state law and/or pursuant to *parens patriae* and/or common law authority.  These state laws authorize the Plaintiff States to seek temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief, to prevent the waste, dissipation, and loss of charitable assets, and/or to stop ongoing donor deception caused by Defendants' violations of state law.  These state laws also authorize the Plaintiff States to obtain civil penalties, attorneys' fees, expenses, and costs.

---

[1] As used here, the attorney general of Utah refers to the Utah Attorney General as counsel to the Division of Consumer Protection, and in his capacity to enforce the TSR pursuant to the Telemarketing Act.

8.      This action is also brought by the Attorneys General of the Plaintiff States and the Attorney General of the District of Columbia pursuant to Section 6103(a) of the Telemarketing Act, which authorizes attorneys general to initiate federal district court proceedings and seek to enjoin violations of, and enforce compliance with, the TSR, to obtain damages, restitution, and other compensation, and to obtain such further and other relief as the court may deem appropriate to stop Defendants' violations of the TSR. 15 U.S.C. § 6103(a).

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the federal law claims pursuant to 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), 6103(a), and 6105(b), and 28 U.S.C. §§ 1331, 1337(a) and 1345. This Court has supplemental jurisdiction over the subject matter of the state law claims pursuant to 28 U.S.C. § 1367.

10.      Venue in this District is proper pursuant to 15 U.S.C. §§ 53(b) and 6103(e), and 28 U.S.C. §§ 1391(b) and (c).

## COMMERCE

11.      At all times material to this complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## PLAINTIFFS

12.      Plaintiff FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices. The FTC is authorized to initiate federal district court proceedings, by its own attorneys,

to enjoin violations of the FTC Act and the TSR and to secure such other equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c), and 6105(b).

13.     The Attorneys General are the chief legal officers for their respective states and commonwealths.  The Secretaries of State are the chief regulators of charities and charitable solicitations for their respective states, and are authorized to enforce their states' laws regarding the solicitation of charitable donations.  The Rhode Island Department of Business Regulation is the chief regulator of charities and charitable solicitations for the State of Rhode Island.  The Utah Division of Consumer Protection is the chief regulator of charities and charitable solicitations for the State of Utah.  The Plaintiff States bring this action pursuant to consumer protection, business regulation, charitable solicitation, and/or charitable trust enforcement authority conferred on them by the following statutes and/or pursuant to *parens patriae* and/or common law authority:

| | |
|---|---|
| Alabama: | ALA. CODE §§ 8-19-1 through -15; and §§ 13A-9-70 through 76. |
| Alaska: | ALASKA STAT. §§ 45.50.471 through 45.50.561; and §§ 45.68.010 through 45.68.900. |
| Arizona: | ARIZ. REV. STAT. ANN. §§ 44-1521 through 44-1534; and §§ 44-6551 through 44-6561. |
| Arkansas: | ARK. CODE ANN. §§ 4-28-401 through 4-28-416; and §§ 4-88-101 through 4-88-115. |
| California: | CAL. GOV. CODE §§ 12580 through 12599.6; CAL. BUS. & PROF. CODE §§ 17200 through 17206; and §§ 17510 through 17510.95. |
| Colorado: | COLO. REV. STAT. §§ 6-1-101 through 115; and §§ 6-16-101 through 114. |
| Connecticut: | CONN. GEN. STAT. §§ 21a-175 through 21a-190l; and §§ 42-110a through 42-110q. |
| Florida: | FLA. STAT. ch. 501, Part II; and ch. 496 (2013). |
| Georgia: | GA. CODE ANN. §§ 43-17-1 through 43-17-23 (2011). |
| Hawaii: | HAW. REV. STAT. § 28-5.2; §§ 467B-9.6, 467B-9.7(d), 467B-10.5; and § 480-15. |
| Idaho: | IDAHO CODE ANN. §§ 48-601 through 619; and §§ 48-1201 through 1206. |
| Illinois: | 225 ILL. COMP. STAT. §§ 460/0.01 through 460/23. |
| Indiana: | IND. CODE §§ 23-7-8-1 through -9; and §§ 24-5-0.5-1 through -12. |

| Iowa: | IOWA CODE § 714.16. |
|---|---|
| Kansas: | KAN. STAT. ANN. §§ 17-1759 through 17-1776. |
| Kentucky: | KY. REV. STAT. ANN. §§ 367.110 through 367.300. |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1401 through 1427; and §§ 51:1901 through 1909.1. |
| Maine: | ME. REV. STAT. ANN. tit. 5, §§ 205-A through 214. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-101 through 6-701 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS ch. 12 §§ 8 through 8M, 10; ch. 68 §§ 18 through 35; and ch. 93A §§ 1 through 11. |
| Michigan: | MICH. COMP. LAWS §§ 400.271 through 400.294. |
| Minnesota: | MINN. STAT. ch. 309. |
| Mississippi: | MISS. CODE ANN. §§ 79-11-501 through 79-11-529. |
| Missouri: | MO. REV. STAT. ch. 407. |
| Montana: | MONT. CODE ANN. §§ 30-14-103 and 30-14-111. |
| Nebraska: | NEB. REV. STAT. §§ 21-1901 through 21-19,177; §§ 59-1601 through 59-1622; and §§ 87-301 through 87-306. |
| Nevada: | NEV. REV. STAT. §§ 598.1305, 598.0915(15), 598.096, and 598.0963. |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:19; 7:20; 7:21; 7:24; 7:28; 7:28-c; 7:28-f; and 641:8. |
| New Jersey: | N.J. STAT. ANN. §§ 45:17A-18 through 45:17A-32(c); §§ 56:8-1 through 56:8-20; and N.J. ADMIN. CODE §§ 13:48-1.1 through 13:48-15.1. |
| New Mexico: | N.M. STAT. §§ 57-12-1 through 57-12-22; and §§ 57-22-1 through 57-22-11 (1978). |
| New York: | N.Y. EXEC. LAW §§ 63(12) and 171-a through 175; N.Y. GEN. BUS. LAW § 349; and N.Y. NOT-FOR-PROFIT CORP. LAW § 112. |
| North Carolina: | N.C. GEN. STAT. §§ 75-1.1 and 131F-23 and -24. |
| North Dakota: | N.D. CENT. CODE §§ 50-22-01 through 50-22-07; and §§ 51-15-01 through 51-15-11. |
| Ohio: | OHIO REV. CODE ANN. § 1716. |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 §§ 552.1 through 552.22. |
| Oregon: | OR. REV. STAT. §§ 128.886; and §§ 646.605 through 646.636. |
| Pennsylvania: | 10 PA. CONS. STAT. §§ 162.1 through 162.23 (1990). |
| Rhode Island: | R.I. GEN. LAWS §§ 5-53.1-1 through 5-53.1-18. |
| South Carolina: | S.C. CODE ANN. §§ 33-56-10 through 33-56-200. |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21; and §§ 21-34-1 through 21-34-14. |
| Tennessee: | TENN. CODE ANN. §§ 48-101-501 through 48-101-522. |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.41 through 17.63. |
| Utah: | UTAH CODE ANN. §§13-22-1 through 13-22-23; 13-26-1 through 13-26-11; and 13-11 through 13-11-23. |

| Vermont: | VT. STAT. ANN. tit. 9 §§ 2453 through 2461; and §§ 2471 through 2479. |
| Virginia: | VA. CODE ANN. §§ 57-48 through 57-69. |
| Washington: | WASH. REV. CODE § 19.86 and §19.09. |
| West Virginia: | W.VA. CODE §§ 29-19-1 -15b; and §§ 46A-1-101 through 46a-6-110. |
| Wisconsin: | WIS. STAT. §§ 202.11-202.18. |
| Wyoming: | WYO. STAT. ANN. §§ 40-12-101 through 114. |

14.     Pursuant to authority found in 15 U.S.C. § 6103(a), the Attorneys General of the Plaintiff States and the District of Columbia are also authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

## DEFENDANTS

15.     Defendant Cancer Fund of America, Inc. ("CFA"), also d/b/a Breast Cancer Financial Assistance Fund, is a Delaware corporation headquartered in Knoxville, Tennessee. CFA also maintained administrative offices in Mesa, Arizona from 2002 through 2007, and had employees working in Arizona as recently as 2009. CFA's articles of incorporation represent that it is organized and will operate as a nonprofit corporation. CFA has received an exemption from federal income tax from the Internal Revenue Service ("IRS") pursuant to Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C § 501(c)(3). Notwithstanding this, CFA is organized to carry on business for its own profit or the profit of its members within the meaning of Section 4 of the FTC Act. In 2012, CFA began using the name "Breast Cancer Financial Assistance Fund" in some of its charitable solicitations. In the past, several states have brought legal actions against CFA for, among other things, inadequate board governance, improperly valuing gift-in-kind contributions, and making misrepresentations about its charitable programs. Such actions include those brought by Connecticut (Connecticut by Riddle v. Cancer Fund of America, Inc., CV-89-0361764 (Superior Ct.) (stipulated order entered in 1991)); Pennsylvania (Com., by Preate v. Cancer Fund of America, Inc., 277 M.D. 1992

(Commonwealth Ct.) (stipulated order entered in 1995)); New York (State by Vacco v. Cancer Fund of America, Inc., No. 95 Civ. 402993 (N.Y. Sup. Ct.) (stipulated order entered in 1996)); Vermont (State of Vermont v. Civic Dev. Group, et al., No. 863-98 (Superior Ct.) (stipulated order entered in 2001)); Massachusetts (Com. of Massachusetts v. Chenevert, 99-0405 (Superior Ct.) (stipulated order entered in 2005)); and Georgia (Doyle v. Cancer Fund of America, Inc., 2007 CV 131522 (Superior Ct.) (complaint filed in 2007 and resulting in settlement)). Defendant James Reynolds, Sr. heads CFA. Acting alone or in concert with others, directly or indirectly, by telemarketing and other means, CFA has made misrepresentations to donors regarding its purported charitable programs. CFA transacts or has transacted business in the District of Arizona and throughout the United States.

16.     Defendant Cancer Support Services, Inc. ("CSS"), also d/b/a Cancer Fund of America Support Services, is incorporated in the District of Columbia as a nonprofit corporation whose purpose is to support the activities of CFA. CSS's articles of incorporation represent that it is organized and will operate as a nonprofit corporation. Notwithstanding this, CSS is organized to carry on business for its own profit or the profit of its members within the meaning of Section 4 of the FTC Act. CSS sought and received recognition of tax exemption from the IRS as a Type III Functionally Integrated Section 509(a)(3) supporting organization, as defined by the Internal Revenue Code, 26 U.S.C § 509(a)(3). The IRS requires that substantially all of such a supporting organization's activities be in direct furtherance of the supported organization's mission, and specifically advises that fundraising is not a direct furtherance activity. CSS's sole activity is to operate a fundraising call center in Dearborn, Michigan that solicits the public for donations. After expenses, CSS gives virtually all funds it has raised to CFA as "grants." CSS entered into an Assurance of Voluntary Compliance with the state of Oregon in 2008 to resolve allegations that it had made misrepresentations in charitable solicitations, In the Matter of Cancer Fund of America Support Services, No. 0808-11372 (Multnomah Cnty. Circuit Ct., Aug. 11, 2008). Acting alone or in concert with

1   others, directly or indirectly, by telemarketing and other means, CSS has made

2   misrepresentations to donors regarding its purported charitable programs. CSS transacts

3   or has transacted business in the District of Arizona and throughout the United States.

4        17.    CSS operates and has operated as a common enterprise with CFA. From

5   2008 through September 2013, Defendant Kyle Effler ("Effler") served as the president

6   and chief financial officer of CSS. Effler, who was also the chief financial officer of

7   CFA, operated CSS from his CFA office in Knoxville, Tennessee. CSS did not pay

8   Effler a salary; managing CSS was one of his job duties at CFA. Other CFA employees

9   assisted Effler with operating CSS in the course of their employment with CFA. CFA

10  has maintained CSS's books and records on its computers and has issued CFA credit

11  cards to CSS employees for business use. In addition, auditors conducted only single

12  reviews of the consolidated financial records of CFA and CSS. CFA and CSS have filed

13  such audits with state regulators. CFA employees have served as board members of CSS,

14  undertaking CSS-related functions during CFA work hours. CFA board members have

15  also served as CSS board members. CFA board meeting minutes explained that the

16  arrangement with CSS "allows CFA to receive funds in the form of grants, without the

17  accompanying costs of fundraising. This will greatly improve the efficiency of

18  operations of CFA, and present to the public an organization that manages its resources

19  with greater efficiency." Defendant James Reynolds, Sr. became interim president

20  following Effler's resignation.

21       18.    Defendant Children's Cancer Fund of America, Inc. ("CCFOA") is an

22  Arizona nonprofit corporation currently headquartered in Powell, Tennessee. CCFOA

23  was headquartered in Mesa, Arizona from its inception in 2004 to 2006, and it continues

24  to station one employee in Arizona. CCFOA's articles of incorporation represent that it

25  is organized and will operate exclusively as a nonprofit corporation. CCFOA has

26  received an exemption from federal income tax from the IRS pursuant to Section

27  501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). Notwithstanding this,

28  CCFOA is organized to carry on business for its own profit or that of its members within

the meaning of Section 4 of the FTC Act.  Defendant Rose Perkins heads CCFOA.

Acting alone or in concert with others, directly or indirectly, by telemarketing and other means, CCFOA has made misrepresentations to donors regarding its purported charitable programs.  CCFOA transacts or has transacted business in the District of Arizona and throughout the United States.

19.     Defendant The Breast Cancer Society, Inc. ("BCS"), also d/b/a The Breast Cancer Society of America, is a Delaware corporation headquartered in Mesa, Arizona. BCS's articles of incorporation represent that it is organized and will operate as a nonprofit corporation.  BCS has received an exemption from federal income tax from the IRS pursuant to Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C § 501(c)(3). Notwithstanding this, BCS is organized to carry on business for its own profit or that of its members within the meaning of Section 4 of the FTC Act.  Defendant James Reynolds, II heads BCS.  Acting alone or in concert with others, directly or indirectly, by telemarketing and other means, BCS has made misrepresentations to donors regarding its purported charitable programs.  BCS transacts or has transacted business in the District of Arizona and throughout the United States.

20.     Defendant James Reynolds, Sr. ("Reynolds, Sr."), an individual, is the executive director of CFA and president of its board of directors.  He has held these positions since 1987.  He is also the interim president of CSS.  Individually and in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of CFA and CSS as set forth herein.  Reynolds, Sr. has the authority to control and has controlled the conduct of CFA.  Among other things, he has hired employees, signed contracts, hired fundraisers, approved telemarketing scripts and other solicitation materials, recruited board members, and overseen the financial affairs of CFA.  Reynolds, Sr. also has the authority to control and has controlled the conduct of CSS.  For example, on behalf of CSS, Reynolds, Sr. has recruited board members, negotiated contracts, approved telemarketing scripts and other solicitation materials, approved loans, terminated existing business relationships, and initiated new business relationships.  In

addition, Effler routinely consulted with Reynolds, Sr. about the management of CSS.
Reynolds, Sr. has personally profited from the deception alleged herein.  He transacts or
has transacted business in this District.

21.     Defendant Kyle Effler ("Effler"), an individual, was the president of CSS
from mid-2008 through September 2013.  He was also employed at CFA from 1990 to
October 2014, first as an accountant and later as chief financial officer.  Individually and
in concert with others, he formulated, directed, controlled, or participated in the acts and
practices of CFA and CSS as set forth herein.  Among other things, Effler hired
employees, signed contracts, approved telemarketing scripts and other fundraising
materials, recruited board members, and oversaw the financial affairs of CSS and CFA.
Effler has personally profited from the deception alleged herein.  He transacts or has
transacted business in this District.

22.     Defendant Rose Perkins ("Perkins"), an individual, is the former wife of
Defendant Reynolds, Sr.  She is the president of CCFOA's board of directors and also its
executive director.  Perkins has held these positions since 2005.  From 1987 to 2005, she
was employed as vice president of CFA.  Individually and in concert with others, she has
formulated, directed, controlled, or participated in the acts and practices of CCFOA as set
forth herein.  Among other things, she has hired employees, signed contracts, hired
fundraisers, approved telemarketing scripts and other solicitation materials, recruited
board members, and overseen the financial affairs of CCFOA.  Perkins has personally
profited from the deception alleged herein.  She transacts or has transacted business in
this District.

23.     Defendant James Reynolds, II, a/k/a James Reynolds, Jr. ("Reynolds, II"),
an individual, is the son of Reynolds, Sr.  He is the chief executive officer of BCS and,
until September 2013, was also president of its board of directors.  He has held these
positions since BCS's inception in 2007.  From 1992 through the end of 2008, he was
employed by CFA in various positions, most recently as vice president of fundraising.
Reynolds, II also was a founding board member of CSS and served as president of the

CSS board of directors until October 2008.  In addition, he incorporated CCFOA in 2004 and served as its president until turning the position over to his then-step-mother, Rose Perkins.  Individually and in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of BCS as set forth herein.  Among other things, he has signed contracts, hired fundraisers, approved telemarketing scripts and other solicitation materials, recruited board members, overseen the financial affairs of BCS, and hired employees, including his current wife, Kristina Reynolds.  Reynolds, II has personally profited from the deception alleged herein.  He transacts or has transacted business in this District.

24.     Hereafter, CFA, CSS, CCFOA, and BCS are referred to collectively as the "Corporate Defendants," and Reynolds, Sr., Effler, Perkins, and Reynolds, II are referred to collectively as the "Individual Defendants."  The Corporate Defendants and Individual Defendants are referred to collectively as "Defendants."

## DEFENDANTS' BUSINESS PRACTICES

### *A Profitable Endeavor*

25.     The Corporate Defendants are sham charities created and controlled by Defendant Reynolds, Sr. and his extended family and friends for their personal profit.  Since at least 2008, and continuing to the present, Defendants have collected tens of millions of dollars in contributions from unwitting, generous, donors by claiming to help people suffering from cancer.  Defendants have deceived donors into believing that their contributions support bona fide charities that use contributions primarily to provide cash grants and material supplies directly to cancer patients, children with cancer, and individuals with breast cancer in the United States.

26.     In reality, the Corporate Defendants do not operate as bona fide charities.  Instead of operating for the benefit of cancer patients or otherwise serving legitimate, mission-related purposes, Corporate Defendants primarily support private interests.  From 2008 through 2012, the Corporate Defendants collectively spent 87.9% of contributions from individual donors paying for-profit fundraisers and other fundraising

costs and compensating the Individual Defendants, related persons, and other employees. In contrast, Defendants collectively spent less than 3% of donors' contributions on the cash and goods sent to cancer patients in the United States.

27.    In addition, charitable contributions have financed personal loans to Individual Defendants, employees, and other insiders, and paid for trips for the Individual Defendants, their families, and friends to Las Vegas, New York, Disney World, and other locations. Funds donated to help cancer patients have also paid for goods and services used primarily for the private benefit of Individual Defendants, employees, and other insiders. For example, donated funds were used to pay for vehicles, personal consumer goods, college tuition, gym memberships, Jet Ski outings, dating website subscriptions, luxury cruises, and tickets to concerts and professional sporting events.

28.    Defendants' advertised charitable causes were simply the mechanisms through which they created employment opportunities for themselves, their friends, and their family members, and funded other private benefits. The Corporate Defendants operated as personal fiefdoms characterized by rampant nepotism, flagrant conflicts of interest, and excessive insider compensation, with none of the financial and governance controls that any bona fide charity would have adopted.

### A Shared History

29.    Family members – Defendants Reynolds, Sr., Perkins, Reynolds, II – and long-time associate Effler control the Corporate Defendants. In addition to these individuals, an inter-related group of their family members, friends, and fellow church members have worked as employees and served as board members of the Corporate Defendants.

30.    Reynolds, Sr., who spawned the deceptive fundraising scheme in 1987, has been in control of CFA for more than two decades. He has described CSS and CCFOA as "spin-offs" of CFA, and explained that setting up CCFOA and BCS helped CFA because CFA was "really top heavy" with executives. Reynolds, Sr. started CSS in 2002 to help raise funds for CFA. He and Effler have directed the operations of CSS from

CFA's headquarters. Reynolds, II and Eric Fransen ("Fransen"), the former BCS board chairman and current BCS vice president, have both served on the CSS board of directors.

31.     CCFOA started as a special project of CFA. It split off from CFA in late 2004. Reynolds, II served as its initial president while also employed at CFA. Fransen also served with Reynolds, II on the CCFOA Board. They turned CCFOA over to Perkins, who left CFA to run CCFOA. Five other CFA employees joined Perkins at CCFOA, and two individuals left the CFA board to serve on the CCFOA board. In 2010, at Reynolds, Sr.'s direction, CFA gave CCFOA a grant of $50,000.

32.     Reynolds, II, who began working at CFA when he was 16, learned the cancer business from his father. Before starting BCS, while at CFA, Reynolds, II tested fundraising specifically for breast cancer patients, setting up a separate fundraising campaign with CFA's main telemarketer, Associated Community Services. Donations for this campaign were deposited into CFA accounts until Reynolds, II established BCS and signed a separate fundraising contract with Associated Community Services. In 2008, at Reynolds, Sr.'s direction, CFA provided BCS a grant of $50,000.

33.     With the formation of each different corporate entity, the Individual Defendants created new opportunities to solicit charitable contributions and new sources of cash to fund their personal lifestyles. With each different corporate entity, the Individual Defendants also created new opportunities to employ or otherwise provide cash compensation to family members, friends, and fellow church members.

34.     Consistent with their common roots, the Corporate Defendants have operated in a substantially similar manner. They have hired many of the same fundraisers, contracted with many of the same vendors, accountants, and attorneys, and used similar fundraising materials. The Corporate Defendants also have engaged in substantially similar international GIK transactions, and have used the same improper methods to claim, value, and classify those transactions. Because of these similarities, they have deceived the public in similar ways.

*Rampant Nepotism*

35.    From 2008 through at least 2012, the Corporate Defendants failed to observe rudimentary corporate governance practices commonly followed by legitimate charities.  Among other things, CFA, CCFOA, and BCS have served as sources of employment for the Individual Defendants' extended family and friends, without regard for their qualifications.  This has resulted in Defendants hiring and retaining unqualified employees, creating and staffing unnecessary jobs, and authorizing unnecessary employee expenses.  It also has affected programming decisions.  Collectively and individually, between 2008 and 2012, the Corporate Defendants spent more cash compensating the Individual Defendants and their friends and family members than on the cash and goods provided to cancer patients in the United States.

36.    At CFA, Reynolds, Sr. employs or has employed:  his two sons, Defendant Reynolds, II and Michael Reynolds; his former stepson Lance Connatser ("Connatser"), Connatser's wife, Julaporn Connatser, and Connatser's sister-in-law, Sakulrat "Ootz" Perkins; his former stepdaughter, Michelle Morse, her husband, Brian Morse, and her brother-in-law, Eugene Morse; two former sons-in-law, Josh Loveless and James Tyler Smith; and daughters Dawn Reynolds and Lindsay Reynolds (now deceased).  CFA also employs Kyle Effler's son, Brandon Effler.  Reynolds, Sr. has continued to employ family members regardless of where in the country they live.  When Michael Reynolds and Josh Loveless moved to Montana, Reynolds, Sr. had CFA open a "chapter" in Montana – the only such chapter in the country – to keep them on the payroll.  The chapter was not successful and has been closed.

37.    Between 2008 and 2012, CFA paid its employees substantially more than it spent on the cash and goods it provided to cancer patients in the United States.  As the executive director of CFA, Reynolds, Sr. has hired employees, set their salaries, authorized employee benefits, determined bonuses and raises, authorized loans of charity funds to employees, and made promotion decisions – including for his relatives.  Reynolds, Sr. has made these decisions on his own, with little or no input or supervision

from the CFA board of directors.  As president of the CFA board, Reynolds, Sr. has voted on annual employee bonuses awarded by the board – including his own.

38.     At CCFOA, Perkins has followed a similar path.  She employs or has employed:  her sister, Claudette Sparks; her two daughters, Michelle Morse and Lindsay Reynolds; her son-in-law, Brian Morse; her former son-in-law James Tyler Smith; her daughter-in-law, Julaporn Connatser; her grandson, Hunter Morse; her long-time friend, Peggy Farvin; her stepdaughter's sister-in-law, Tara Loveless Howard; and her daughter's sister-in-law, Lynda Morse.  CCFOA has also compensated Perkins's step-nephew, Darby Sparks, as an independent contractor.

39.     Between 2008 and 2012, CCFOA paid these employees more than twice the amount it provided in financial assistance to children with cancer in the United States – CCFOA's stated mission.  As the executive director of CCFOA, Perkins has hired these friends and family members, set their salaries, determined their benefits, approved bonuses and raises, and made promotion decisions.  Perkins has handed out across-the-board employee bonuses of up to 10% of salary twice yearly.  She has set bonus amounts based on the cash available in CCFOA's checking account, without regard for budget, spending on program services or other expenses, or employee performance.  As an employee, Perkins has received the same perks and bonuses as other employees, so in effect she has been determining her own benefits and bonuses.  Perkins has made these decisions on her own, with no input or supervision from the CCFOA board of directors and despite the obvious conflicts of interest.

40.     At BCS, Reynolds, II has operated similarly.  After becoming romantically involved with his now-current wife, Kristina Reynolds, he promoted her to be his "Operations and Public Relations Manager" – a newly created, second-in-command position at a significantly higher pay scale, and for which he neither advertised nor interviewed other candidates.  He also hired (or authorized her to hire):  Kristina Reynolds's two sisters, Liana Lopez and Tracy Wilson; Kristina Reynolds's son, Chester Cawood; her step-nephew, Jeffrey Westerman; and her mother, Diana Tenney.  None of

these employees was qualified for their respective positions. For example, Ms. Tenney, who was previously a caterer, was hired to write grants. Reynolds, II also hired then-chairman of the BCS board, Eric Fransen, to operate a BCS satellite location – which BCS decided to place in Edgemont, Pennsylvania, conveniently near Fransen's home. (With Reynolds, II's approval, Fransen then hired his wife and mother-in-law to work there.)

41.    Between 2008 and 2012, BCS paid these employees considerably more than the amount it provided in financial assistance to individuals with breast cancer in the United States – its stated primary purpose. As the chief executive officer of BCS, Reynolds, II has hired employees, set their salaries, approved a full-time work week of 35 hours, authorized employee benefits (which he took advantage of as well), determined bonuses and raises, authorized loans to employees, and made promotion decisions – including, in each case, for his relatives. Reynolds, II has made these decisions on his own, with little or no input or supervision from the BCS board of directors and despite the obvious conflicts of interest. When he was president of the BCS board, Reynolds, II voted on annual employee bonuses awarded by the board. Although he did not vote on his own bonus, he voted on Fransen's bonus and Fransen voted on Reynolds, II's bonus.

42.    In each instance, rather than hiring employees, setting salaries or approving employee benefits with the goal of promoting genuine charitable purposes, the Individual Defendants have furthered their own private interests – and the corporations' boards have done nothing to stop them. Bona fide charities do not engage in such conduct.

### Personal Use of Charitable Assets

43.    In addition to providing the Individual Defendants, their friends, and their family members with steady, lucrative employment, each Corporate Defendant has spent significant amounts of money on goods, services, and travel purchased for the use and enjoyment of private individuals. These actions, too, demonstrate that the Corporate Defendants operated primarily for the profit of the individuals who ran them.

44.    At CFA, until recently the organization paid for cars for nine individuals and still provides a car for Reynolds, Sr., despite no apparent need for business travel. In the past, CFA has also made a short-term, interest free loan, approved by Reynolds, Sr., to Michael Reynolds, and paid college tuition for Reynolds, II, Connatser, Josh Loveless, and Effler. Until recently, CFA provided employees with company credit cards, but had no written policies about personal use of such cards. Reimbursement for personal charges on company cards was not required until the end of each year, so in effect CFA was floating short-term, interest-free loans to its employees. Some personal charges were not repaid at all. Purchases of gas, car washes, meals at Hooters and other restaurants, cell phone apps and games, and movie tickets were all bought with CFA credit cards and ultimately paid for by donors. In addition, on one occasion, CFA paid for its board members and employees (and their spouses) to go on a Carnival cruise in the Caribbean, ostensibly for board training purposes. CFA has funded other such "board training" trips for board members, employees, and their families at other luxury destinations.

45.    CCFOA has operated in a similar manner. It too provided cars to employees in the past, and continues to provide a car to Perkins, despite no apparent need for business travel. Likewise, it paid college tuition for Perkins's daughter-in-law, Julaporn Connatser. CCFOA has also allowed employees to use company credit cards for personal expenses. Employees were not required to repay CCFOA for these personal expenditures until the end of each calendar year, and thus effectively received interest-free loans from CCFOA. Perkins has routinely used her CCFOA credit card for personal expenditures, and no one at CCFOA has reviewed her card use to ensure that she has identified and repaid all such personal expenses. Corporate credit cards have also been used for personal expenses that have not been repaid, including numerous purchases of gas and food, movie tickets, and online purchases from vendors like iTunes. CCFOA has also paid for extravagant "training" trips for board members, employees, and their families, including on two occasions, all-expense paid trips to Disney World. CCFOA even paid a babysitter to accompany them.

46.     BCS also operated in a similar manner.  It previously provided employees with cars and continues to provide a car for Reynolds, II, despite no apparent need for business travel.  BCS employees, including Reynolds, II, have enjoyed such perks as gym memberships and college tuition.  BCS also allowed employees to use corporate credit cards for personal expenses, and did not require repayment until the end of each year, effectively providing them with interest-free loans.  BCS credit cards were used to purchase movie tickets, video games, food, gas, car washes, Jet Ski rentals, meals at Hooters, and purchases at Victoria's Secret.  BCS has also provided loans to employees, repaid student loans, and footed the bill for employees' significant others to attend out-of-town events.

47.     The cash used to buy these goods and services and to make these loans was contributed by donors, who were told that their contributions would be spent helping cancer patients.  While bona fide charitable organizations may provide perks or other benefits as part of employee compensation, such benefits are not typically authorized by family members, do not extend to purely personal items, and are governed by clear written employee policies.  Here, the employment opportunities and perks provided to insiders by these sham charities have far exceeded the benefits that they purported to provide to cancer victims.  Bona fide charities do not engage in such conduct.

### *Failed Board Oversight*

48.     The extravagant insider benefits that the Individual Defendants conferred on their friends and family members have gone unchecked by each organization's board of directors.  This is by design:  board members, hand-picked by the Individual Defendants, have not been independent and have not acted independently.  Instead, they have rubber-stamped decisions by Reynolds, Sr., Effler, Perkins, and Reynolds, II.  The boards of each organization have been populated with relatives of the Individual Defendants, relatives of employees, long-time family friends, employees of other Corporate Defendants, and members of the Individual Defendants' church.  In numerous instances, individual board members have had little or no experience with the

corporations' missions or in nonprofit management, and lack the qualifications required for oversight of these multimillion-dollar enterprises.

49.    These boards have failed to observe even routine corporate governance procedures practiced by legitimate charities. Board members (other than the Individual Defendants) have not regularly reviewed financial expenditures by the organizations, and not even the board treasurers have engaged in financial oversight or analysis. CFA and CSS have not used board-approved budgets at all. At CCFOA and BCS, board members have not participated in creating annual budgets and have approved them without question. After budgets were approved, the BCS and CCFOA boards did not engage in any ongoing review of expenses or program accomplishments against the budgeted numbers. Any such review would have revealed to each of the boards the disparity between cash expended on fulfilling the charitable mission and cash expended on corporate insiders, along with other budget issues. For example, the CCFOA board approved a salary increase for Perkins at a time when CCFOA was scaling back its sole program due to lack of funds. At BCS, Reynolds, II's salary increased in 2010 from $257,642 to $370,951, but that same year net donations decreased, as did the amount of direct cash aid the organization provided to individuals with breast cancer, its much-touted primary program. The CFA board was equally oblivious. Having not reviewed corporate expenses, it authorized increases to staff bonuses and salaries in 2012, at a time when fundraising costs were up and CFA had suspended its main charitable program, supposedly due to lack of funds.

50.    The boards have not set mission-related goals, and have not engaged in strategic or financial planning related to programming. The boards have not conducted annual elections of officers or board members and have had no term limits for board service. Nor have they held senior management accountable for hiring unqualified personnel, maintaining inappropriate staff levels, improperly reviewing employee performance, or failing to implement financial controls. They also failed to limit extravagant and unnecessary employee benefits.

51.     The boards also have not regularly observed conflict of interest policies prohibiting board members from acting on matters in which they were self-interested. Nor have the boards required the corporations or the staff to observe conflict of interest policies that prohibit self-dealing.  For example, at CFA in 2008, at Reynolds, Sr.'s suggestion, the board, including Reynolds, Sr., voted to hold open the job of his son, Reynolds, II, for two years in case his venture with BCS did not succeed.  (The CFA board had provided Perkins the same safe harbor in 2005 when she left CFA for CCFOA.)  At CCFOA, each board member, including Perkins, signed a conflict of interest policy that prohibited compensating interested persons – yet the board knew that Perkins had hired, set salaries, determined bonuses, and set benefits for her relatives. And at BCS, even after then-board chairman Fransen learned that Reynolds, II was romantically involved with his now-current wife, Kristina Reynolds, the BCS board continued to allow Reynolds, II to promote her and set her salary, bonuses, and benefits, at least until their marriage, and to do the same for her sisters, mother, and children.

52.     Again and again, the Corporate Defendants' boards have ratified decisions that furthered the private interests of the Reynolds clan, and ignored or failed to question policies and practices that benefitted those private interests at the expense of their charitable missions.  Boards of bona fide charities do not engage in such conduct.

### *Failed Executive Review*

53.     The boards of directors have exercised no meaningful management or control over the organizations they purport to govern.  The boards have abdicated most responsibilities to the Individual Defendants, over whom they have exercised no meaningful control.  The boards have not reviewed the job performance of Reynolds, Sr., Effler, Perkins, or Reynolds, II.  At CFA and CCFOA, board-approved bonuses were not related to revenue, performance, or achievement of strategic goals, and were approved for multi-year periods, often with minimal board-level discussion.  For example, the boards of CFA and CCFOA authorized twice-yearly staff bonuses of up to 10% of salary, and allowed Reynolds, Sr. and Perkins to determine their own bonuses within that range.  At

CFA, Reynolds, Sr. recommended his own salary increases to the board for approval. At BCS, the board approved a salary range and annual increases for Reynolds, II, but allowed him to set his own salary and annual increases within that range without review. Also at BCS, when Fransen was simultaneously chairman of the board and an employee, he was supervised nominally by Reynolds, II, while also ostensibly supervising Reynolds, II.

54. The CFA, CCFOA, and BCS boards did not have established compensation committees and approved CEO compensation without independently evaluating the appropriate salary ranges for similarly qualified CEOs or executive directors of comparably sized organizations with similar programs. Instead, these boards have routinely approved salaries in ranges suggested to them by Reynolds, Sr., Perkins, and Reynolds, II, based on information (also provided to them by these individuals) about salaries at other, supposedly comparable organizations. These "comparable" organizations were chosen based in part on annual gross revenues, which for CFA, CCFOA, and BCS included tens of millions of dollars in GIK revenue, not cash income, and did not accurately reflect the size or complexity of their business operations. Boards of directors of bona fide charities do not operate in this manner.

**Telemarketing Contracts Confer Private Benefit on Third Party Fundraisers**

55. In addition to benefits privately inuring to the Individual Defendants, their families, and their friends, CFA, CCFOA, and BCS have significantly benefitted the private interests of for-profit fundraisers who have solicited in their names, including, for example, Associated Community Services. Contracts with such fundraisers typically have specified that the fundraisers would be paid 80% or more – sometimes as much as 95% – of each dollar raised. As a result, between 2008 and through 2012, CFA, CCFOA, and BCS reported fundraising costs of more than $120 million. (This does not include amounts paid by CSS to its employee-fundraisers.)

56. Fundraisers have also benefitted from unrestricted access to the lead lists of CFA, CCFOA, and BCS. In numerous instances, fundraising contracts signed by

Reynolds, Sr., Perkins, and Reynolds, II have provided for-profit fundraisers unrestricted use of the donor list developed by that fundraiser, and limited the current and future use of such lists by CFA, CCFOA, and BCS. Access to these lists has significantly benefited fundraisers, because donors who answer the phone and contribute to one cause are more likely to respond to solicitations for other causes. Access to names of donors who contributed to CFA, CCFOA, or BCS lowers the cost to fundraisers of acquiring lead lists and increases their response rate when soliciting for other organizations.

57.    For some charities, high fundraising costs can be attributed to start-up expenses or seeking support for unpopular causes. That is not the case here. CFA and CCFOA have been in existence for years, and seeking support for cancer-related causes is neither unpopular nor controversial. Moreover, because it is usually cheaper and easier to obtain contributions from past donors, typically fundraising expenses decline as organizations develop a database of loyal donors. Yet, by allowing fundraisers unfettered use of their donor lists, CFA, CCFOA, and BCS have never benefitted from the reduced costs associated with soliciting past donors, and have continued to pay even long-term fundraisers the same high rates. Indeed, in 2011, instead of decreasing the amount paid for fundraising, the largest fundraiser for CFA and CCFOA, Associated Community Services, *increased* its contractually required payment from 80% to 85% of all funds raised for CFA and CCFOA. Reynolds, Sr., Perkins, and Reynolds, II have routinely approved these fundraising contracts, and the boards of directors of CFA, CCFOA, and BCS have remained silent, tacitly ratifying their use.

58.    CFA, CCFOA, and BCS have also failed to police the activities of their fundraisers. After providing fundraisers with approved scripts and other solicitation materials, CFA, CCFOA, and BCS have engaged in no further oversight. Defendants have done nothing even after a state takes legal action against a fundraiser for making misrepresentations, as, for example, did Michigan in 2013, against Associated Community Services. In the Matter of Associated Community Services, Inc., File No. 2013-0039412-A (Cease and Desist Order and Notice of Intended Action), available at

1  http://www.michigan.gov/documents/ag/05.28.13_Notice_of_Intended_Action_with_exh

2  ibits_422463_7.pdf.  Indeed, other than cashing the checks, Defendants have done little

3  more than sign the fundraising contracts.

4      59.    Bona fide charities protect important assets like donor lists.  They also seek

5  to protect their reputations by monitoring their fundraisers and the representations they

6  make to the public.  These Defendants did neither.

7                    ***Donor Deception***

8      60.    Through telemarketing, direct mail, websites, social media and other online

9  forums, and in publicly filed documents, Corporate Defendants have represented and

10  continue to represent that contributions to them go to support legitimate charities that

11  primarily focus on directly assisting individuals suffering from cancer in the United

12  States.  In addition, in numerous instances, Corporate Defendants have represented that

13  donations funded programs that provided pain medication to cancer patients,

14  transportation to chemotherapy appointments, or paid for hospice care.  As described

15  below, these representations were false.  Relying on those claims, generous Americans

16  opened their pocketbooks and contributed tens of millions of dollars to aid cancer

17  patients.  Defendants exploited this generosity.  Had donors known how their

18  contributions actually would be spent, they would not have contributed.

19          *Misrepresentations that contributions will go to legitimate charities*

20      61.    Corporate Defendants raised more than $187 million from donors across

21  the country between 2008 and 2012.  Central to the success of their solicitations was the

22  overarching claim, direct or implied, that contributed funds would support bona fide

23  charities whose primary purposes were charitable.  Defendants have made this claim in

24  solicitation materials and telemarketing scripts, including, e.g., claims that:

25      • CFA is "a national nonprofit charity"; "a national health agency"; "on the

26          forefront of the fight against cancer" or "on the front lines for the fight

27          against cancer";

28

- CSS is "a nationwide charity just like the Red Cross and the Salvation Army";
- CCFOA "operates exclusively as a charitable organization"; is "a national nonprofit charity"; or "is on the forefront of actually helping needy children with cancer"; and
- BCS is a "national breast cancer charity."

Implicit in every request for a "contribution" and every claim to be a "nonprofit" or a "charity" was the promise that the Corporate Defendants were legitimate charities serving charitable purposes.

62.     In fact, the Corporate Defendants operated primarily for the benefit of private interests.  Their priorities were reflected not just in how they operated, as described in Paragraphs 25 – 59, above, but also in how they spent donors' money.  The bulk of contributed funds went first to the for-profit fundraising companies who solicited the contributions.  The remaining funds were then used primarily for salaries and other benefits enjoyed by the Individual Defendants and their friends and families.  Thus, between 2008 and 2012, CFA and CSS spent 86.4% of donors' contributions paying compensation and fundraising costs.  (CFA and CSS figures are reported together because they operated as a common enterprise and contributions to CSS supported the operations of CFA).  In contrast, CFA and CSS spent 2.8% of donors' contributions on cash and goods provided to cancer patients and nonprofits in the United States.  In the same time period, CCFOA spent 88.8%, of donors' contributions on compensation and fundraising.  In contrast, CCFOA spent 3.4% of donated funds on the cash and goods it provided to families of children with cancer in the United States.  Also between 2008 and 2012, BCS spent 89% of donors' contributions on compensation and fundraising costs.  In contrast, BCS spent 2.4% of donors' contributions on the cash, goods, and other services it provided to breast cancer causes in the United States.

63.     Under these circumstances, it was deceptive to claim that Corporate Defendants were bona fide charities or that contributions would be used primarily for

charitable purposes.  Donors expected that their contributions would be spent primarily on charitable purposes, and likely would have made different donating decisions if they had known the truth.



Fundraising Expenses and Employee Compensation Compared to Amount Spent on U.S. GIK and Financial Assistance (2008-2012)

64.    In telemarketing calls, direct mail, websites, social media, and in publicly filed documents, Corporate Defendants described to donors numerous worthwhile programs that contributions would supposedly fund.  These programs included, for example, providing cash grants directly to indigent cancer patients and their families, supplying needy cancer patients directly with medicine and medical supplies, including pain medication, providing transportation to chemotherapy appointments, paying for emergency groceries and utilities, offering treatment counseling, and providing needed goods and supplies to hospices across the country.  These programs supposedly all focused on aiding indigent cancer patients in the United States.  Donors relied on these representations and contributed to support these causes.

65.     In fact, in numerous instances, the Corporate Defendants spent either nothing, or an infinitesimal amount, on the specific programs described.  The purposes for which contributions would be used were central to donors' decisions to contribute funds to these organizations.  If donors had known that most of their contributions would be spent in other ways and for unrelated purposes, and not been deceived, they would have made different donating decisions.  Specific misrepresentations about program benefits by each of the Corporate Defendants are discussed below.

### *Misrepresentations by CFA*

66.     CFA, in numerous instances, has made misrepresentations about the purpose, size, and scope of its charitable programs.  These misrepresentations have occurred in solicitation materials, such as direct mail pieces and telemarketing scripts that CFA approved for use by telemarketers, on the CFA website, and in other public statements,

67.     In response to these claims, in 2012 alone, generous Americans contributed more than $5.2 million to fundraisers soliciting for CFA.  In total, from 2008 through 2012, donors gave CFA fundraisers $29.7 million.

68.     CFA's misrepresentations have included, but were not limited to, statements like:

- CFA is a "national health agency," "a nationwide patient assistance organization,"  and a "national cancer organization";
- CFA is "making a difference in the lives of tens of thousands of Americans";
- CFA's "number one priority is patient care," it "concentrates its efforts on patient care," is "devoted primarily to direct patient aid," and that "commitment for the care of the individual is still the primary focus of our mission";

- CFA helps "by providing direct services and assistance to financially needy cancer patients and their families, such as the loan of equipment and various supplies, etc.";
- CFA "works to provide aid to indigent patients of this devastating disease";
- CFA is "providing support, products, supplies and services to financially indigent patients";
- CFA is "a Tennessee-based national non-profit organization whose mission is to provide direct support and services to financially indigent patients....";
- CFA "helps tens of thousands of cancer victims and hundreds of hospice organizations on a yearly basis . . . ."

69.    In fact, CFA's "direct patient aid" program consisted of sending individuals with cancer boxes of seemingly random items.  Such noncash donations are referred to as "gifts-in-kind" ("GIK").  These GIK packages typically included a small quantity of Carnation Instant Breakfast drink, adult briefs and bed pads, and a large assortment of what CFA euphemistically described as "comfort items."  In the past, boxes have included things like sample-size soaps, shampoos, and other toiletries, over-the-counter medications, Little Debbie Snack Cakes, toys, disposable plates and plastic cutlery, scarves, batteries, women's makeup, family-themed DVDs, adult-sized clothing, iPod Nano covers, gift wrap, blank seasonal greeting cards, candy, and/or children's coloring books.  CFA employees and volunteers pre-packed boxes with an assortment of identical items, until supplies of any given item ran out.  Thus, every individual received the same items, regardless of age, gender, clothing size, or personal preference.  Individual recipients could also request latex exam gloves, and, on some occasions, box fans and blankets.

70.    CFA did not consult with medical professionals about the relative need or usefulness to cancer patients of any of the items it provided to individuals.  It had no health care professionals or cancer specialists on its staff.  Reynolds' explanation for buying Little Debbie Snack Cakes for cancer patients was because "they make people

happy." He justified a switch to purchasing Moon Pies because they "make you happier."

71. CFA did not require recipients to demonstrate financial hardship. To receive "direct patient aid," individuals submitted an application to CFA, signed by a medical professional verifying a cancer diagnosis. There were no other qualifications and no means testing. Once an individual was accepted, CFA would ship boxes of assorted items to that person every other month for up to two years (except for the months when CFA suspended its shipping due to lack of funds). After receiving the first package, individuals were required to call CFA to request additional shipments. In 2012, CFA shipped boxes to 4,378 individuals. In lieu of shipping boxes to Alaska and Hawaii, CFA provided individuals in those states with cash assistance, sending them checks for $50. Only 113 individuals received direct financial assistance from CFA from 2008 through 2012.

72. CFA made the same goods it shipped to individuals available to nonprofits in the United States. Hospices, health care providers, and other nonprofits could order up to four boxes of Carnation Instant Breakfast, and, when available, slightly larger quantities of adult diapers, bed pads, and exam gloves. They could also receive boxes of items like those provided to individuals, but in quantities sufficient for five to twenty people.

73. On some occasions, due to a claimed lack of funds, CFA suspended its program and stopped shipping products to individuals and nonprofits. For example, it made no shipments from September 2012 to February 2013. On other occasions, CFA suspended or limited the number of new applicants to whom it would start sending packages.

74. CFA purchased some of the products it sent to individuals and nonprofits. For example, it routinely bought Carnation Instant Breakfast or other liquid supplement drinks, adult diapers, bed pads, exam gloves, and Little Debbie Snack Cakes. Occasionally it also purchased air freshener, blankets, box fans, and jewelry.

75.     CFA obtained most of the items it sent to individuals and nonprofits – the program described to donors – from procurement agents. Such agents gather and make available to nonprofits overstocked, out of season, or discontinued merchandise. To acquire these goods, CFA paid procurement agents between 2% and 5% of the goods' retail value. Despite paying this relatively small percentage of the goods' retail value, CFA claimed the original retail value of its GIK distributions when reporting its program expenses, rather than reporting the actual amount CFA paid to obtain the goods. For example, in 2012, CFA reported program expenditures that included donations of GIK goods valued at $2.65 million to individuals and nonprofits in the United States, but only spent $314,000 to acquire these goods. This actual expenditure amounts to less than 2.3% of donors' contributions to CFA and CSS in 2012. Almost none of donors' contributions were spent on the actual goods and financial assistance provided to patients, CFA's stated "number one priority."

76.     Moreover, even though CFA claimed that its primary purpose was to provide direct aid to cancer patients or assistance to hospices and other health care providers on a national basis, a significant portion of CFA's U.S. "program" has consisted of donating goods to nonprofits with purposes wholly unrelated to assisting cancer patients. Many of these organizations were located in and around Knoxville, Tennessee. For example, CFA contributed merchandise it valued at $688,476 to a Knoxville food bank. Other contributions went to the Knoxville Toys for Tots drive, a Knoxville Firefighters Association, a Knoxville-area youth soccer program, and a Knoxville nonprofit dedicated to enriching the lives of the disabled through dance. Senior centers, churches, and schools in the Knoxville area also benefitted. In 2012, CFA contributed fewer goods to nonprofits with missions related to cancer and health care than it contributed to other kinds of nonprofits. Donors choosing to support a "national" program of direct aid to cancer patients, or assistance to hospices and other health care providers, reasonably would have expected their contributions to be spent supporting

such programs and not spent supporting food banks, senior centers, and churches in and around Knoxville, Tennessee.

77.     In light of its actual program expenditures, CFA was not, in fact, a "national health agency" and its "number one priority" was not "patient care." It did not directly help "tens of thousands of Americans," and its resources were not devoted "primarily to direct patient aid." These claims were deceptive and misled donors to believe that CFA was a large organization that assisted many individuals with cancer in a profound way.

78.     In addition, in numerous instances, CFA, directly or through its telemarketing agents, made misrepresentations about specific programs, including, but not limited to claims that:

- CFA helps supply emergency items such as oxygen, transportation to chemotherapy treatment, and medications, and loans equipment to individual cancer patients;
- CFA provides life-saving items to cancer patients;
- CFA provides medical equipment and supplies to cancer patients or "helps provide medical support and services";
- CFA helps cancer patients financially; and
- CFA helps provide cancer patients with pain medications.

79.     Most of these claims were simply false. CFA had no program that supplied cancer patients with emergency items such as oxygen, provided transportation to chemotherapy appointments, or loaned equipment to cancer patients. Nor did it provide meaningful "life-saving items," "pain medication," or "medical support and services" to cancer patients.

80.     CFA's claim to provide cancer patients with "medical supplies" was also deceptive. Even if adult diapers, bed pads, and vinyl gloves might be construed by donors as "medical supplies," so little of CFA's program expenditures was devoted to

purchasing such items that any claims that donations would be used for such purposes were inherently misleading.

81.     Similarly, claims that CFA helped cancer patients financially implied the existence of a substantial charitable program to do so, and did not accurately represent the extraordinarily limited nature of the financial assistance actually provided by CFA to individuals.  In 2012, the amount of direct cash aid that CFA provided to individuals was just 0.15% of donations to CFA and CSS.  From 2008 through 2012, CFA provided $61,614 in direct cash aid to 113 individuals – 0.1% of the $75.8 million CFA and CSS received in donations.  Under these circumstances, it was deceptive for CFA to claim to engage in a program that provided direct financial aid to cancer patients.

82.     Whether scripted or unscripted, telemarketers' descriptions about the services CFA provided were intended to tug at donors' heartstrings and open their wallets, with little regard for accuracy.  One telemarketing script approved by CFA in 2008 even directed telemarketers trying to convince reluctant donors to say: "I understand [your hesitation to give]; however we never want to have to tell a family that is stretching their finances to the breaking point that 'We're sorry but the CANCER FUND has fallen short of its fundraising goal, so we won't be able to provide you with a wig for your child to cover the hair loss due to chemotherapy!'"  In fact, at that time CFA did not maintain a program to provide wigs for children in chemotherapy.

### Misrepresentations by CSS

83.     CFA has made additional misrepresentations to donors through its so-called "supporting organization," CSS.  As discussed above, CFA controls the conduct of CSS and together the two corporations have operated as a common enterprise.  The sole mission of CSS is to raise funds for CFA.  Like other professional fundraisers, CSS has spent a significant amount of funds paying for telemarketers, technology, and overhead – at least 73% of every dollar donated.  Unlike other charities, CSS itself has not engaged in the charitable programs it describes to donors.  Instead, it has told donors about charitable programs supposedly engaged in by CFA.

84.     In solicitation materials such as direct mail pieces and telemarketing scripts, on its website, and in other public statements, CSS has claimed that it directly provides aid to cancer patients, hospices, and nonprofit health care organizations.  CSS does none of these things.  In response to such claims, generous Americans gave $8.2 million to CSS in 2012.  Between 2008 and 2012, donors gave CSS over $41.15 million.

85.     CSS has made these misrepresentations in numerous instances, including, but not limited to, statements like:

- "[W]e want to let you know that we are continuing our cancer aid program this year, we are the ones that provide the free supplies & dietary supplements directly to the families that are fighting cancer and also to over 600 hospices and other health care providers. . .";

- "[W]e are NOT about research, we give direct aid to those that already have cancer and are in need";

- "Cancer Support Services is hard at work helping struggling cancer patients get their daily items";

- "Cancer Support Services is diligently working on helping cancer patients in need, we do this by providing cancer patients with the support they need, like dietary supplements, medical supplies, and other items";

- "Cancer Support Services differs greatly from other cancer groups in that its number one priority is funding patient aid rather than research";

- "We help cancer patients anywhere in the United States.  Men, women, children, um, with over two hundred forty types of cancer";

- "[T]ens of thousands of cancer patients contact us for help";

86.     In fact, CSS has never directly provided aid to cancer patients, hospices, or nonprofit health care organizations in the United States.  Instead, it has provided cash grants to CFA.  Claims that CSS engaged in any direct patient aid were false.

87.     In numerous instances, CSS telemarketers have made additional misrepresentations about programs CSS supposedly conducted.  These have included, but are not limited to, statements that CSS itself provides hospice care, as in the following:

- "We also do the hospice care for the terminally ill and we supply over 600 hospice offices with medical supplies all over the United States";
- "We just want you to know that your generous contribution went a long way to help cancer patients out directly with their hospice care and their medical supplies";
- "We also do the hospice care for the terminally ill …";
- "We're the hospice care.  We provide those medical supplies and items for men, women, and children with, with a four-stage cancer";
- "So we're just trying to keep the doors [open for] hospice care, you know that's kind of touch and go you never know …";
- "We're the ones that do the hospice care for the cancer patients afflicted with cancer from infants to adults"; and
- "One hundred percent of our proceeds go to hospice care."

88.     In fact, CSS does not provide hospice care, does not fund hospices, and 100% of donations do not go to hospice care.  CFA also has not provided hospice care to cancer patients.  Such representations were completely fabricated.  Even assuming that CSS telemarketers were describing CFA's programs, the number of hospices in the United States to which CFA has provided any assistance was grossly inflated.  CFA has sent its care packages to some nonprofit health care organizations, including a handful of hospices, but it has not supplied 600 hospices, much less provided them with meaningful amounts of medical supplies.  Donors who relied on these representations and contributed money to CSS were deceived, and legitimate hospice providers deprived of support that might otherwise have gone to them.

*Misrepresentations by CFA and CSS about fundraising costs*

89.     CSS also has used its nonprofit status to mislead donors about the cost of fundraising and to vastly overstate its efficiency in using their contributions.  For example, in numerous instances, CSS has made statements in telemarketing calls including, but not limited to:

- "I'm not a telemarketer so I work directly for the charity…";
- "[T]he great thing about it, us, is that we, I'm not a telemarketer.  We, 100% of the money that we raise goes directly to the charity.  We do not have a professional fundraising company that we have to share your contribution with.  We are the charity calling you directly";
- "One hundred percent of your contribution goes directly to the charity.  I'm not doing a fundraiser and I'm not calling with um, with a telemarketing firm … I'm calling you directly from the charity";
- "We're a nationwide charity just like the Red Cross and the Salvation Army"; and
- "One hundred percent of your contribution goes into the fund where we purchase medical supplies for these cancer patients."

90.     In fact, although CSS is organized as a nonprofit, it operates solely as a telemarketer for CFA.  Despite its (false) assertions, 100% of donors' contributions did not go to support the charitable programs described to them.  Instead, funds donated to CSS first were used to pay CSS's significant fundraising costs and compensation – about 73% of each donation.  After this first cut, most of the remaining funds were sent to CFA.

91.     In its financial statements, CFA reported the revenue it received from CSS but no concomitant costs.  This made it appear that CFA spent donors' money more efficiently than it actually did.  CSS gave CFA $7.96 million between 2008 and 2012, which CFA reported as contributed revenue.  This additional amount caused CFA's ratio of fundraising cost to donations to diminish from 82.9% to 67.4%, making CFA appear more efficient to donors.  In fact, because CFA controlled CSS and CSS engaged in no

programming itself, an accurate representation of the administrative and overhead costs by CFA would have included both the revenue generated by CSS and its expenses. CFA's practice of reporting only the revenue from CSS's operations deceived donors.

92.     Donors have a right to know how their contributions are being spent – and by whom.  Interposing additional entities between the contribution and the charitable program increases costs and dilutes the impact and efficiency of donors' contributions.  If donors had known the truth about CSS's "programs," and not been deceived, they likely would have chosen to avoid such costs and contributed directly to an entity that truly engaged in charitable programs.

### Misrepresentations by CCFOA

93.     CCFOA, in numerous instances, has represented that it engages in a substantial charitable program dedicated to providing financial assistance to the families of children suffering from cancer.  CCFOA has made these claims in solicitation materials, such as direct mail pieces and telemarketing scripts that CCFOA approved for use by its telemarketers, on its website, and in other public statements.

94.     In response to such claims, generous Americans contributed $6.36 million to CCFOA in 2012.  Between 2008 and 2012, donors gave CCFOA $39.5 million.

95.     CCFOA's misrepresentations about its programs have included, for example:

- "Finding tangible help when a child is stricken with cancer is both frustrating and difficult to obtain.  We alleviate much of that burden so the family can get on with the business of loving and caring";

- "The Children's Cancer Fund of America is, with your help, assisting children and their parents cope with the daily struggles of cancer by providing direct financial aid to pay for expenses not covered by insurance";

- "The Children's Cancer Fund of America provides financial assistance to medically indigent families having a child with cancer.  Monthly checks sent to family to help defray daily living cost";
- "The Children's Cancer Fund of America, Inc., operates exclusively as a charitable organization dedicated to assistance and support of children suffering from cancer and their families through financial aid";
- Donations to CCFOA will go to "many families facing financial devastation in their children's struggle with cancer. . .";
- "We have a combined work experience of nearly 50 years helping cancer patients of all ages, arming us with the knowledge of how to target the most pressing of financial needs, and then rallying to the cause with direct aid";
- "Children's Cancer Fund of America is in the forefront of actually helping needy children with cancer by providing public education and financial assistance to help pay for expenses"; and
- "CCFOA programs fight the ravages of childhood cancer in the following ways:  Financial Assistance: Immediate assistance cuts through the red tape to help with immediate needs and expenses not covered by insurance."

96.     Despite CCFOA's representations about its claimed largesse, and the millions of dollars it collected, CCFOA has done almost nothing for children with cancer. For example, in 2012 CCFOA provided $45,026 in financial assistance to 723 recipients – 0.71% of donations.  That same year CCFOA paid Perkins a salary of $231,672.

97.     To receive aid, a family needed to call CCFOA to request an application, and then complete and return the original application form with the signature of a medical professional confirming a child's cancer diagnosis.  CCFOA imposed no financial qualifications and families received the same monthly amount – between $25 and $100 – for up to 24 months.  The amount of the checks sent depended on funds available to CCFOA after paying telemarketers, Perkins's and other staff salaries, and other expenses.

For a time CCFOA issued such checks monthly, but by 2012 the program had been scaled back and checks were issued every other month to enrolled families.

98.     CCFOA started a "Patient Perk Pack" program in August 2012.  On months when checks were not provided, it sent families pre-packaged boxes containing a random assortment of items including, for example, backpacks, school supplies, children's hygiene products, children's coats, religious-themed DVDs, and candy.  Like CFA, CCFOA obtained these items from procurement agents that gather and make available to nonprofits overstocked, out of season, or discontinued merchandise in exchange for a handling fee that is a fraction of the retail value of the items.  CCFOA reported that it provided goods valued at $139,373 to families of children with cancer in 2012, but paid only a fraction of that amount to obtain these goods.  Donors were not told that their contributions would support this program.

99.     Including both its cash assistance and the reported value of the contributed goods given away in "Patient Perk Packs," CCFOA provided aid to individuals in the United States valued at just $184,399 in 2012.  This amounted to 2.9% of the $6.36 million donors contributed, and just 1.2% of CCFOA's reported total contributions (individual donors' contributions plus GIK).  Under these circumstances, CCFOA did not operate a substantial charitable program dedicated to providing financial support to the families of children with cancer, and donors' money was not used for the purposes described to them.

100.     In addition to misrepresentations about its financial assistance program, in numerous instances, CCFOA, directly or through its fundraisers, has made misrepresentations about specific programs including, but not limited, to claims that CCFOA helps children with cancer with "hospice needs," "medical supplies," and "pain medication."  For example, one telemarketing script, authorized by Perkins and used by CCFOA's largest commercial fundraiser, Associated Community Services, claimed that "We [CCFOA] are working to provide pain medication, medical supplies and hospice care when families cannot afford them to battle cancer with no financial worries."  These

claims evoked images of cancer-stricken children suffering untreated pain, waiting for medication that donations to CCFOA could help provide. While heart-wrenching, the claims were completely false. CCFOA has never provided pain medication, medical supplies, or hospice care to children with cancer.

### *Misrepresentations by BCS*

101.    BCS, in numerous instances, has made misrepresentations about the purpose, size, and scope of its programs. BCS made these claims in solicitation materials, such as direct mail pieces and telemarketing scripts approved by BCS for use by its telemarketers, on the BCS website, in statements to the Combined Federal Campaign, and in other public statements. In response to such claims, generous Americans contributed $15.1 million to BCS in 2012. From 2008 through 2012, donors contributed $71.7 million to BCS.

102.    Misrepresentations by BCS have included, in numerous instances, claims that providing breast cancer patients in the United States with direct financial assistance is the primary purpose of BCS, and that it has helped thousands of individuals in this way. Such representations have included, but were not limited to:

- "The Breast Cancer Society is one of the few national breast cancer charities in the United States with a primary focus on providing direct help and assistance to those suffering from breast cancer";
- "The Breast Cancer Society is one of the few national breast cancer charities in the U.S. providing direct help and financial aid to those suffering from breast cancer today! TBCS is able to assist families in need of assistance with direct financial assistance";
- "Your support provides necessary aid and funding for medical expenses, nutritional, personal care, transportation, utilities, groceries, and much more to breast cancer patients undergoing desperate financial circumstances due to breast cancer";

- "Your pledge to The Breast Cancer Society ensures that individuals will be helped and comforted through this challenging time of their lives; that those we aid will be provided critical assistance to help pay for the necessary supplies and personal care items insurance companies rarely pay for. The Breast Cancer Society is providing direct HELP to individuals and families";

- "It is the primary mission of TBCS to provide direct aid to those who are suffering from the effects of breast cancer. We have extensive programs in place that allow both financial and material items to be granted to those in need. Your generous support makes a difference in thousands of women's lives who are facing breast cancer";

- "Your donation(s) are appreciated, but more importantly they are desperately needed. [BCS] provides direct support, services, [and] supplies to patients in need and to their care providers. We seek out countless breast cancer victims that could not otherwise afford proper care";

- "We're back to work … [providing] direct financial assistance to women in the U.S. battling breast cancer";

- "The Breast Cancer Society has been able to provide direct assistance to many thousands of breast cancer patients and their families through our partnership with Associated Community Services";

- "[T]hanks to you and so many other Partners of TBCS, thousands of patients are able to receive financial, medical, and emotional aid"; and

- "A unique mission. Direct and immediate financial assistance to victims battling breast cancer so they may meet the challenges of the illness and become survivors."

103.    Despite these claims, providing direct financial assistance to breast cancer patients has not been the primary focus or mission of BCS. Indeed, BCS has not operated a substantial bona fide program providing direct financial assistance to financially needy

individuals with breast cancer at all.  BCS has provided individuals enrolled in its

program with $100 each month, for up to six months.  BCS has limited the number of

patients to whom it would provide direct financial assistance to no more than 250

individuals per month.  It had no financial eligibility requirements for receiving aid,

limiting the program only by requiring recipients to be in active treatment for breast

cancer.

104.   In 2012, BCS provided 496 people with a total of $279,432 in cash

assistance – 1.8% of individual donors' contributions.  In contrast, in 2012, BCS paid

Reynolds, II a salary of $286,901.  Between 2008 and 2012, the amount BCS gave in

direct financial assistance to individuals with breast cancer was just 0.68% of its reported

total contributions (individual donations plus GIK).

105.   Under these circumstances, BCS has not existed primarily to provide

financial assistance directly to financially needy individuals with breast cancer, and it has

not helped "thousands" of women annually.  It has provided a relatively small number of

individuals with some money.  The level of "direct financial assistance" that BCS

provided was so small that it was false and misleading to describe this as BCS's

"primary" mission or otherwise represent that BCS engaged in a substantial program

financially aiding breast cancer patients.

106.   In numerous instances, BCS, has also made representations about the

geographic availability, size, and scope of its Hope Supply Program, including, but not

limited to, statements like:

- "The Hope Supply Program is now serving the east and west coasts.  This
  program offers contributed items that cancer patients can 'shop' for at no
  cost to them"; and

- "Because of incredibly generous and committed friends like you we are: . . .
  providing thousands of people access to our local warehouses which are
  part of the Hope Supply Project."

107.    Through 2012, BCS's Hope Supply Program consisted of two "stores," one in Mesa, Arizona and another in Edgemont, Pennsylvania (near Philadelphia).  BCS opened a third "store" in Bentonville, Arkansas in 2014.  BCS has stocked these "stores" with random merchandise contributed by local retailers, including, e.g., Bed, Bath & Beyond, Babies"R"Us, and The Disney Store.  Like CFA and CCFOA, it has also obtained goods from procurement agents that gather and make available to nonprofits overstocked, out of season, or discontinued merchandise.  Items available at these locations in the past have included baby clothes, children's toys, gift wrap, office supplies, housewares, bedding, women's and children's apparel, shampoo, lotion and other toiletries, over-the-counter medication, and vitamins.  Also like CFA and CCFOA, BCS has spent just a fraction of the goods' reported value to obtain them.  From 2009, when the Mesa "store" opened, through 2012, BCS paid $182,499 for goods that it reported as having a value of $3.6 million.

108.    BCS has made the Hope Supply Program available to anyone who has had breast cancer, whether in active treatment, remission, or cancer free, and imposed no financial eligibility requirements.  Program participants can visit the Hope Supply stores monthly.  There has been no cap on the total number of visits or duration of eligibility. Participants "shopped" at the store for free, taking whatever they liked, without constraint on quantities or value.  Available "shopping" appointments have been restricted – the "stores" typically have been open only for limited hours, each "shopping" visit lasts up to an hour, and no more than one or two individuals have been allowed to "shop" at any given time.  In 2012, a total of 272 individuals "shopped" at the two BCS locations – 182 in Mesa and 90 in Edgemont.  From 2009 through 2012, fewer than 500 individuals "shopped" at these stores.

109.    Claims that the Hope Supply Program has served "the east and west coasts" were exaggerated.  Practicality limits program participants to those within driving distance of the two stores who have transportation available.  In addition, representations that the program has helped thousands of women were simply not true.

110.    In numerous instances, BCS has also misrepresented that it directly provides breast cancer victims throughout the United States with specific assistance such as medical supplies, health supplies, and treatment including, but not limited to, in statements such as:

- "Last thing we want to do is put you in a bind, but these breast cancer patients rely on us every month for their basic medications";
- "[T]he Breast Cancer Society of America wants to be there to help women in need with direct financial aid, health supplies and commodities, treatment counseling; and countless other levels of support to help them defeat this terrible disease.  This special project of the Breast Cancer Society helps thousands of women in need";
- "We're back to work … [p]roviding emergency groceries and utilities for women suffering from breast cancer";
- "The organization's services are available to those in your community. Help is available both nationally and internationally"; and
- "We are working with the breast cancer aide program.  We provide medical, nutritional, personal care supplies, as well as direct financial assistance to women who suffer from this horrible disease."

111.    Additionally, in numerous instances, through its telemarketing agents, BCS has misrepresented that contributions will provide individual breast cancer patients with the following benefits:

- "medical supplies";
- "insurance";
- "help the ladies with pain meds";
- pay for "medical, nutritional, personal care supplies"; and
- "pay for treatment when patients are short on funds; pre-diagnosis exams, and prescriptions.…"

112.   These claims were false.  BCS has not engaged in a substantial program directly helping individuals with breast cancer throughout the United States to receive medical supplies, commodities, or health or personal care supplies.  It does not have a national program that routinely provides breast cancer patients with emergency groceries or pays for utilities, treatment, or pre-diagnosis exams.  Nor does it supply individuals with pain medication or pay for insurance.  While some goods that might be described as medical supplies, health supplies, or personal care items have been available at the two Hope Supply locations, these goods were not available to breast cancer patients throughout the United States, and BCS has not maintained a substantial program making such goods widely available.

### Misrepresentations about Charitable Efficiency: Improperly Reported GIK Used to Disguise Low Charitable Program Expenditures and Minimize High Administrative and Fundraising Costs

113.   The actual amount spent by CFA, CCFOA, and BCS on the cash and goods provided to cancer patients has been so small because of their high fundraising costs and their use of donated funds for salaries, perks, and other benefits to the extended Reynolds clan.  To mask these high administrative and fundraising costs, which the donating public views unfavorably, Corporate Defendants embarked on an extensive scheme involving shipping GIK goods internationally.  The vast majority of the goods shipped were prescription pharmaceuticals that, in numerous instances, could not be distributed or sold in the United States.  Corporate Defendants' participation in this scheme was limited to paying shipping costs and broker's fees to ship containers of goods to organizations in developing countries – but they reported the full value of the shipments as if the prescription medicine and other goods had been donated to, and distributed by, them.

114.   Corporate Defendants used this scheme to create the bookkeeping illusion that they received millions of dollars in contributed revenue and spent millions of dollars on charitable programs ("program spending") with low administrative and fundraising costs.  Through this scheme, between 2008 and 2012, Corporate Defendants collectively

increased their total reported contributed revenue by over $223 million. Simultaneously, in the same five-year period they also increased their reported program spending by over $223 million. This more than doubled their apparent efficiency (the ratio of money spent on program expenses as compared to money spent on total expenses) from 20.7% to 61.5%. In fact, Corporate Defendants should have reported neither this contributed revenue nor the program expenses associated with these international GIK transactions.

115.   Reynolds, II introduced the international GIK shipping scheme to the CFA board in 2008, while he was still CFA's vice-president. According to board meeting minutes, "by agreeing to accept goods and cover the shipping costs, CFA can credit these shipments toward patient services with a substantial offset to our fundraising costs." A PowerPoint presentation to the CFA board by Effler confirmed that effect, observing, "our international shipping component has become very beneficial to boost CFA's program service percentages." CCFOA began its own shipments in 2009, after Reynolds, Sr. referred the broker CFA used, a company named Charity Services International ("CSI"), to Perkins. When BCS was formed by Reynolds, II in 2008, it immediately embraced an international GIK shipping scheme. CSS also reported a handful of shipments.

116.   Corporate Defendants each used CSI, a for-profit entity, to facilitate their GIK transactions. CSI advertised that participants in its GIK program could help "[r]educe fundraising percentages by booking large gift values." To accomplish this, CSI provided Corporate Defendants with a turn-key operation that located donors ("upstream donors") with GIK goods that those upstream donors wanted to give to downstream recipients in foreign countries. These upstream donors – the same two or three organizations were involved in almost all of the Corporate Defendants' international GIK transactions – were nonprofits who had themselves received the goods from some other party, often yet another nonprofit. CSI itself did not possess or hold title to any of the goods reported as GIK revenue by the Corporate Defendants.

117.   CSI provided Corporate Defendants with information about "available" shipments that upstream donors wanted to ship to pre-selected foreign recipients. The information CSI provided included shipping costs, the fees charged by CSI, the estimated value of the shipment, the goods in the shipment, and the destination and recipient of the shipment. If a Corporate Defendant agreed to accept the so-called "donation opportunity," CSI would arrange to ship the goods and provide the Corporate Defendant with paperwork supposedly documenting Defendant's receipt of the donated GIK goods from the upstream donor, the value of the donated goods, and Defendant's distribution of the goods to the downstream foreign recipient. CSI created most of these documents, which in numerous instances were virtually identical form letters, and were often back-dated. They included documents purporting to transfer title to the donated goods from the upstream donor to Corporate Defendants, documents purporting to provide values for the goods, documents purporting to verify receipt of the goods by downstream recipients, and documents discussing the downstream recipient's purported further distribution of the goods.

*Defendants Improperly Reported Receipt and Distribution*
*of GIK They Did Not Own*

118.   Under applicable accounting rules, in numerous instances Corporate Defendants did not have legal ownership of the GIK goods that they claimed to have received. As a result, they should not have reported the goods' value as contributed revenue or program expense. Among other things, Corporate Defendants could not permissibly claim ownership of the donated GIK because, in numerous instances, they had neither physical nor constructive possession of the goods, and did not assume the risks and rewards of ownership.

119.   Other than paying CSI's fee, Corporate Defendants, in numerous instances, did nothing to solicit, locate, or facilitate the contributions they supposedly received from upstream donors, which were themselves nonprofits that had received the goods from yet other upstream donors. Corporate Defendants did not know the identity of the pharmaceuticals' manufacturers or the origin of the goods, and they had no direct contact

with the upstream donor.  They did nothing to verify that the supposed donor actually possessed the right to transfer title of the goods, or to determine whether use of the goods had been restricted in any way.  For example, in numerous instances, Corporate Defendants reported receiving donations from an upstream donor, World Help, when World Help did not have title to the goods it supposedly donated to Corporate Defendants.  Corporate Defendants could not legitimately claim to own such goods.

120.  Corporate Defendants also could not permissibly claim ownership of the donated GIK because, in numerous instances, they had no discretion in choosing the beneficiary of the goods.  Other than paying CSI's fee, in numerous instances, Corporate Defendants did nothing to locate or research the foreign beneficiary or facilitate its receipt of the donated goods.  CSI's communications about "donation opportunities" routinely listed the planned destination and foreign recipient for available shipments. Corporate Defendants could accept or reject the opportunity to participate in any given transaction, but could not change the shipment's destination or beneficiary.  In numerous instances, prior to accepting CSI's advertised shipment opportunity, Corporate Defendants had had no prior contact with the foreign recipients.  Corporate Defendants did not typically communicate directly with the foreign recipients at all.  Instead, in numerous instances, such communications were handled by the upstream donors or by CSI.  Corporate Defendants did not verify the recipients' needs for, or potential uses of, the goods, did not restrict such uses, and received little documentation regarding the end uses of the goods, which were often redistributed by the foreign recipients to other organizations.

121.  Corporate Defendants also, in numerous instances, lacked documents related to these GIK transactions that owners of GIK goods are expected to maintain. Without such documentation, Corporate Defendants could not claim the GIK as contributed revenue.  What documentation that Corporate Defendants did have had come from CSI and did not adequately substantiate Corporate Defendants' claimed receipt, possession, and subsequent distribution of the goods.  Among other things, documents

from CSI included thank you letters and distribution reports supposedly sent by foreign recipients to Corporate Defendants but that were instead manufactured by CSI using form letters, letterhead, and digital signatures on file in CSI's computers.  In numerous instances, such documents were backdated.  In other instances, documents described GIK transactions that were literally impossible.  For example, in some instances, the upstream donors purported to transfer title of goods to Corporate Defendants <u>after</u> the shipment had been received by the foreign recipient.

122.    Under these circumstances, Corporate Defendants did not own the GIK goods; they were simply acting as "pass-through" agents between the upstream donors and end recipients.  Such intermediaries may not report the value of goods passing through their hands as contributed revenue or as program service expense in their financial statements.

*Corporate Defendants Improperly Reported the Value of GIK*

123.    Even assuming, *arguendo,* that in some instances Corporate Defendants could have properly claimed the GIK goods' value as contributed revenue or reported it as program expense, in numerous instances, Corporate Defendants used improper valuation methods to inflate the reported values of donated goods.  Corporate Defendants also failed to retain appropriate documentation of those valuations.

124.    Corporate Defendants relied almost exclusively on CSI for valuation information.  In numerous instances, CSI valued pharmaceuticals using the average wholesale price in the United States as listed in the "Red Book: Pharmacy's Fundamental Reference."  That valuation method failed to consider numerous factors including the relevant market for the goods (i.e., whether they could be sold in the United States), the goods' physical condition (including the expiration dates of pharmaceuticals), current market conditions, and the legally permissible uses for the donated goods.  CSI's methods, in numerous instances, resulted in inflated and unsubstantiated claims of value.  For example, in numerous instances, CSI valued particular drugs at U.S. wholesale prices even when there was no U.S. market for the drugs because an upstream donor had

restricted their use to a particular foreign country or because the drugs had expired. U.S. wholesale drug prices, in numerous instances, are much higher than prices in other markets, so assigning a value based on sale in a U.S. market results in a higher value than, for example, assigning a value based on a market in Africa or Central America.

125. Corporate Defendants were ultimately responsible for the valuations they reported in financial documents. In numerous instances, however, they did nothing to oversee, monitor, audit, or otherwise check CSI's processes and procedures for such valuations. They did not ascertain that the contents of the shipments were as described in the inventory lists they received from CSI. Nor did they make sure that donated pharmaceuticals were not expired or were in otherwise useable condition. In numerous instances, inventory lists provided by CSI to Corporate Defendants did not specify the drugs' expiration dates. In other instances, when expiration dates were provided, some of the listed drugs had expired or were very close to expiring. (A drug's expiration date affects its monetary value as well as its efficacy.)

126. Corporate Defendants also failed to maintain records supporting the valuations provided by CSI, including, for example, documents related to CSI's qualifications for conducting appraisals of value, documents detailing the specific valuation method(s) used by CSI, the assumptions made by CSI in determining appraised values, and records of CSI's conclusions of fair value.

*Deceptive Impact of Reporting GIK Transactions*

127. The increased contributed revenue and program spending Corporate Defendants reported – collectively over $223 million – had the effect of diminishing the reported percentage of revenue they spent on fundraising and administrative costs and increasing the proportion of reported expenses they spent on program services, making Corporate Defendants appear more efficient to donors than they actually were. Thus, the reported international GIK revenue for the five years from 2008 through 2012 resulted in CFA's reported fundraising expenses being 25.4% of total contributions. In reality, 67.4% of consumers' donations (including revenue from CSS), or 82.9% without

counting CSS's "contributions" to CFA, were spent on fundraising. For the same period, CCFOA used its international GIK revenue to report fundraising expenses of 47% of total contributions. In reality, 81.5% of consumers' donations were spent on fundraising. Similarly, BCS reported fundraising expenses of 29% of total contributions, while in reality 84.6% of consumers' donations were spent on fundraising. Corporate Defendants also used the inflated contributed revenue amounts when choosing purported "comparable organizations" for setting their executives' pay, thus improperly increasing the Individual Defendants' salaries.

128.    Corporate Defendants obtained the paperwork they used to claim these figures for just the cost of the payment to CSI (which included both CSI's fees and shipping costs). For example, in connection with a 2011 shipment to Guatemala, CFA reported contributed revenue and corresponding program expense of over $8 million, but only paid CSI a fee of $50,550. For one 2010 shipment to Ghana for which CCFOA reported contributed revenue and program expense of over $3.8 million, CCFOA paid CSI just $39,960. In addition, for a 2011 shipment to Honduras for which BCS reported contributed revenue and program expense of at least $3.8 million, BCS paid CSI just $28,120. Although Corporate Defendants used such transactions to add hundreds of millions of dollars in program expenses to their financial reports, these "programs" existed entirely on paper. Corporate Defendants did not possess the goods and played no role in their overseas distribution. They hired no additional staff to manage these multimillion-dollar international GIK programs and in most instances spent virtually no staff time on them. In addition, the very high dollar values associated with these transactions largely resulted from overvalued pharmaceuticals.

129.    Corporate Defendants claimed these illusory numbers in financial reporting documents like informational tax returns filed with the IRS, commonly known as Forms 990, and in documents filed with numerous state regulators. In connection with such filings, Corporate Defendants certified that the information contained therein was "true, accurate, and complete," sometimes under penalty of perjury. States often make such

documents publicly available so that prospective donors may research charities before making donation decisions. The public, together with state charities regulators, relied on this information in evaluating the performance and effectiveness of the Corporate Defendants. Charity watchdog groups that provide consumers with information about charities also considered Corporate Defendants' reported contributed revenue, program spending, and fundraising and administrative costs when evaluating them. Such financial information was also reported to federal employee donors in Combined Federal Campaign materials.

130.    By reporting these GIK transactions as contributed revenue and program expenses, at inflated values, Corporate Defendants represented themselves to be both larger and more efficient than they actually were. They obscured the high percentage of donated funds spent on, among other things, for-profit fundraisers, executive salaries, and employee perks, and concealed the very small amounts spent on the charitable purposes described to donors. As a result, the Forms 990 and other documents filed by Corporate Defendants with the IRS and state regulators, and made publicly available to consumers, were false and misleading.

*Misrepresentations Related to CFA's Inflated GIK Reporting*

131.    From 2008 through 2012, CFA improperly reported over $58.5 million in international GIK contributed revenue and commensurate program expenditures associated with its international GIK transactions. CFA used these numbers when publicly touting its size and efficiency, including in newsletters and representations on the Internet. In numerous instances, state regulators relied on CFA's reported numbers to inform their citizens about CFA's efficiency with donor dollars. These numbers were also used by the Combined Federal Campaign to report CFA's alleged fundraising expenses relative to total contributions to prospective donors.

132.    As a result of its reporting of these international GIK transactions, CFA deceived donors about its overall size, the resources it devoted to its programs, and how efficiently it used donors' contributions. For example, it increased its apparent efficiency

(the ratio of program expenses to total expenses) by almost 30 percentage points. CFA also disguised the high percentage of donated funds it spent on, among other things, for-profit fundraisers, executive salaries, and employee perks instead of the charitable purposes described to donors. For example, in 2012, CFA reported fundraising costs relative to total contributions (including international GIK income) as 19%. In contrast, 70% of donors' contributions were spent on fundraising.

133.    In addition, with these reported international GIK transactions, CFA deceived donors about its primary charitable activities and the focus of its programs. As described above, CFA has represented to donors that its mission is "direct patient aid" for Americans with cancer. CFA has emphasized this purported mission in solicitation materials with claims that it is a "national" health agency, that "CFA is making a difference in the lives of tens of thousands of Americans," that CFA is helping people on a "national basis," and by the very nature of its name, Cancer Fund *of America*.

134.    In fact, using CFA's valuations, in 2012 the international GIK accounted for 87.8% of the value of all aid CFA claimed to provide (international and domestic). The international GIK did not assist people with cancer or health-related nonprofits in the United States, and it did not provide direct aid to cancer patients anywhere. Moreover, in numerous instances, the pharmaceuticals involved in these shipments had little to do with treating cancer. For example, the prescription medication lamotrigine, which constituted a significant percentage of the value of shipments claimed by CFA in 2010, 2011, and 2012, is commonly used to treat epilepsy and bipolar disorder, and not to treat cancer. Other medications and medical supplies, like antibiotics and syringes, might have been used in connection with treating cancer patients, but were just as likely to have been used by hospitals and medical clinics to treat other medical conditions.

135.    In numerous instances, CFA's claimed shipments went to foreign recipients who then re-distributed the goods to other organizations. CFA had no way of verifying how those organizations used the goods. Moreover, in numerous instances, distribution reports received by CFA explicitly documented that many contributed goods were widely

distributed to the general populace and were not used specifically to assist cancer patients. For example, one 2011 shipment to Liberia included medicine and medical supplies contributed to clinics and hospitals for general use, as well as products that "helped the Liberian people such as orphans, mothers, children and young adults." While these were worthy causes, they were not causes that donors were told their contributions would support.

136.    Under these circumstances, CFA's representations to donors about the focus of its programs were deceptive – most of the aid CFA claimed to provide had nothing to do with directly helping cancer patients in the United States and often had nothing at all to do with helping people suffering from cancer.

*Misrepresentations Related to CCFOA's Inflated GIK Reporting*

137.    From 2008 through 2012, CCFOA improperly reported over $29 million in GIK revenue and commensurate program expenditures associated with its international GIK transactions. CCFOA used these numbers when publicly touting its size and efficiency. For example, the Combined Federal Campaign used these numbers to inform prospective donors about CCFOA's alleged fundraising expenses relative to total contributions. Before CCFOA started its international GIK shipping program, the 2009 Combined Federal Campaign reported CCFOA's fundraising expenses relative to total contributions as 84.8% (based on 2008 numbers). In the 2013 campaign, the Combined Federal Campaign reported CCFOA's fundraising costs relative to total contributions as 38% (based on 2012 numbers). In reality, in 2012, CCFOA spent 85% of consumers' donations on fundraising expenses. In numerous instances, state regulators relied on CCFOA's claimed revenue and program expenses to inform their citizens about CCFOA's efficiency.

138.    As a result of its reporting of the international GIK transactions, CCFOA deceived donors about both its overall size and how efficiently it used their contributions. For example, in 2012, its reported efficiency (the ratio of program expenses to total expenses) more than quadrupled, increasing from 13% to 63%. CCFOA also obscured

the high percentage of donated funds it spent on, among other things, for-profit fundraisers, executive salaries, and employee perks instead of on the charitable purposes it described to donors.

139.   Through these reported international GIK transactions, CCFOA also deceived donors about its primary charitable activities and the focus of its programs.  In solicitation materials and elsewhere, CCFOA has represented to donors that its mission is to provide financial help to the families of American children with cancer.  This has included solicitation materials that focus on claims that CCFOA provides direct financial assistance to pediatric cancer patients and even by the very nature of its name, Children's Cancer Fund *of America*.

140.   Using CCFOA's valuations, in 2012, the international GIK it reported accounted for 98% of the value of all aid CCFOA claimed to provide (international and domestic).  The international GIK shipments, however, had nothing to do with providing financial aid to families of children with cancer in the United States, and often had little to do with cancer – or children – at all.  For example, some shipments contained goods such as deep fat fryers, bread machines, electronic equipment, and adult men's undershirts.  In many instances, the pharmaceuticals involved – which comprised the bulk of the value of the shipments – were not related to treating cancer, much less pediatric cancer.  For example, some medications such as the antibiotic ciprofloxacin, which constituted a large percentage of the value of a 2010 shipment to Guatemala, are expressly contraindicated for use in treatment of children.  In another shipment, the three medications with the highest claimed value were Mirapex, Terbinafine HCL, and Atrovent, which are used to treat Parkinson's disease, skin fungus (jock itch), and mild cold symptoms, respectively.  In numerous instances other medications, medical supplies, and goods that were shipped might have been provided to children with cancer but were just as likely to have been used to treat adults and other medical conditions.

141.   In numerous instances, CCFOA's claimed shipments went to foreign recipients who then re-distributed the goods and pharmaceuticals to other organizations.

CCFOA failed to verify how, or even if, those organizations used the goods.  In some instances, distribution reports received by CCFOA explicitly documented that many contributed goods were widely distributed and their use unrestricted to pediatric cancer patients.  For example, the majority of one 2011 shipment to Guatemala consisted of medicine and medical supplies that were distributed to rural clinics and hospitals throughout the country for general use.  While assisting health care providers in Guatemala was a worthy cause, it was not the cause that donors were told their contributions would support.

142.  Under these circumstances, CCFOA's representations to donors about the focus of its programs were deceptive – most of the aid CCFOA claimed to provide was not financial assistance to families of children with cancer in the United States, and often had nothing at all to do with children or cancer.

*Misrepresentations Related to BCS's Inflated GIK Reporting*

143.  From 2008 through 2012, BCS improperly reported over \$131.9 million in GIK contributed revenue and commensurate program expenditures associated with international GIK transactions.  BCS used these international GIK numbers when publicly touting its efficiency, including in statements to reporters and on its website.  For example, BCS made statements such as: "We are working hard to reduce our fundraising costs and any additional overhead expenses to maximize what we can do with each and every dollar entrusted to us.  For example, we spend only 2% of our revenue on administrative costs, an important step that few national charities with our reach can boast of."  BCS's inflated numbers were also used by the Combined Federal Campaign to inform prospective donors about BCS's alleged fundraising expenses relative to total revenue.  In addition, in numerous instances, state regulators relied on inflated numbers to inform their citizens about BCS's efficiency.

144.  As a result of its reporting of the international GIK transactions, BCS deceived donors about its overall size and how efficiently it used their contributions.  For example, in 2012, its reported international GIK program expenses caused its apparent

efficiency (the ratio of program expense to total expenses) to more than triple, increasing from 22% without the reported GIK expenses, to 75% with them.  Also obscured was the high percentage of donated funds relative to total contributions that BCS spent on, among other things, for-profit fundraisers, executive salaries, and employee perks instead of the charitable purposes it described to donors.  For example, in 2012, BCS reported fundraising costs relative to total contributions (including international GIK income) as 24%.  In contrast, 83% of donors' contributions were spent on fundraising.

145.   Using these reported international GIK transactions, BCS also deceived donors about its primary charitable activities and the focus of its programs.  BCS has represented to donors that its mission is to directly help Americans with breast cancer.  Not only did it assume the d/b/a "The Breast Cancer Society of America" for use in some telemarketing solicitations, its solicitation materials focus on claims about BCS's program of "direct" aid to U.S. breast cancer patients, including specific descriptions of financial assistance to women in the United States, and references to the U.S.-based Hope Supply Program.

146.   In fact, using BCS's valuations, between 2008 and 2012 the GIK BCS claimed to ship internationally accounted for 96.2% of the value of all aid reported by BCS (international and domestic).  The international GIK had nothing to do with providing direct assistance to individuals with breast cancer in the United States.  In numerous instances, the pharmaceuticals, medical supplies, and other goods included in BCS's claimed GIK shipments had little, if anything, to do with treating breast cancer.  For example, a 2012 shipment to the Dominican Republic included lamotrigine (used to treat epilepsy and bipolar disorder), ropinirole hydrochloride (used to treat Parkinson's disease and restless leg syndrome), alendronate sodium (used to treat osteoporosis), levocetirizine (an antihistamine), quinine sulfate (an antimalarial drug), and PSE Brom DM (cold medicine).  These drugs are not typically used for the treatment of breast cancer and, in some instances, are not recommended for use by persons who have had cancer.  Some have even been associated with an increased risk of cancer.  In another

example, in 2010, BCS reported shipping over $6 million worth of mebendazole (deworming pills) to Africa and Central America – again, not cancer-related.

147. In numerous instances, BCS's claimed shipments went to foreign recipients who then re-distributed the goods and pharmaceuticals to other organizations. BCS failed to verify how, or even if, those organizations used the goods. Moreover, in numerous instances, distribution reports received by BCS explicitly documented that contributed goods were widely distributed and their use was not restricted to assisting breast cancer patients. For example, a distribution report for a 2009 shipment to Guatemala made no mention of assisting breast cancer patients. Similarly, a distribution report for a 2009 shipment to the Philippines that BCS valued at $8.84 million made no mention of assisting breast cancer patients, the cause that donors were told their contributions would support.

148. Under these circumstances, BCS's representations to donors about the focus of its programs were deceptive – most of the aid BCS claimed to provide was not in the form of financial assistance to individuals with breast cancer in the United States, and often it had nothing at all to do with cancer.



### ***Defendants Ignored IRS Rules:***
### ***"Direct Aid" Distributions Fail to Meet Charitable Program Standards***

149.   Defendants' administration of the scant charitable programs they did provide failed to meet the IRS's bare minimum definition of program services.  Most of those purported charitable programs have involved aid to individuals with cancer.  For example, CCFOA has sent funds to some parents with children diagnosed with cancer, CFA has sent some packages of goods to people diagnosed with cancer, and BCS has provided some individuals in active treatment for breast cancer with cash assistance.  To receive such benefits – when new patient applications were being accepted – CFA, CCFOA, and BCS have required only the submission of a completed application with the signature of any medical professional attesting to a cancer diagnosis.  They did not restrict eligibility to those in financial need.  Further, they did not verify the accuracy of information reported on the applications.  Each recipient was given roughly the same aid, without regard to financial need, type of diagnosis, or other material criteria.

150.   Under these circumstances, the distributions to individuals by CFA, CCFOA, and BCS do not meet the definition of charitable contributions set forth in 26 U.S.C. § 170 and in IRS regulations.  Charities operating programs that provide funds and goods directly to individuals must satisfy four criteria to report that expenses associated with such programs are charitable.  First, the charity's program must serve a general charitable class of individuals.  This can include those suffering financial hardship from an unexpected event, such as terrorism or a cancer diagnosis.  Second, the charity must establish criteria for determining which members of the charitable class will receive aid.  Third, the charity must have a standing committee to review applications, apply the criteria, and decide who will receive funds or goods.  Fourth, and most importantly, the charity must verify financial need for the program.  Membership in a charitable class is not sufficient to establish the requisite financial need; there must be documentation of an immediate and significant interruption to a person's finances.

Showing additional expenses or a change in lifestyle are insufficient bases to meet this standard.

151.    CFA, CCFOA, and BCS did not follow these rules.  While they purported to serve persons with cancer, and required completion of basic applications to receive aid, they had neither standing committees to review applications nor verification processes to check applicants' financial need.  BCS did not even require applicants to have an active diagnosis of breast cancer to participate in its Hope Supply program.  As a result, these programs have provided an excessive amount of private benefit that outweighed their public benefit.  Thus, none of these distributions to individuals met IRS requirements, and related expenses should not have been reported as charitable program expenses.  This failure to follow IRS standards for program distributions, like so many other actions, demonstrates that the Corporate Defendants did not operate as bona fide charities.

### *Knowing and Willful Misrepresentations*

152.    Defendants knowingly and willfully misrepresented to donors that CFA, CSS, CCFOA, and BCS were legitimate charities and that donations to their organizations would benefit cancer victims.  In reality, and as Defendants knew, most of the cash collected on behalf of the Corporate Defendants was used to benefit private interests; the so-called "charitable" programs provided little or no assistance to people with cancer.

153.    Defendants also knowingly and willfully made specific false claims to donors.  The Individual Defendants authorized telemarketing scripts and solicitation materials that contained false claims, and tolerated unscripted misrepresentations by telemarketers that they learned about from consumer complaints and law enforcement actions.  In connection with international GIK transactions, Corporate Defendants also knowingly and willfully falsely reported contributed revenue, expenses, and values of GIK goods knowing that such reporting misrepresented the size and the efficiency of their charitable programs and the costs to operate them.  The Individual Defendants knew

that the GIK program expenses associated with these international transactions did not represent actual charitable programs engaged in by the Corporate Defendants.  In addition, the Individual Defendants knew that the validity of reporting GIK transactions as they were doing had been increasingly questioned by the media, the public, regulators, and accounting experts.

154.   Such misrepresentations have persisted throughout CFA's existence.  In the past, it has settled state lawsuits alleging, among other things, that CFA had improperly valued gifts-in-kind and made misrepresentations about its charitable programs – and promised not to repeat such conduct.  Both Reynolds, II and Perkins worked at CFA when such lawsuits were filed, and thus were on notice of the allegations.  Despite these state actions, the deceptive practices have continued – often without modification.  For example, Vermont's 1998 action alleged that CFA misrepresented that donations would be used to provide pain medication to cancer-stricken individuals.  CFA telemarketers have continued to make that claim, as have telemarketers for CCFOA and BCS, even though none of the Corporate Defendants has engaged in any such program.  Similarly, CSS has continued to make the same misrepresentations to donors that triggered a 2008 action by Oregon.

155.   Under these circumstances, Defendants knowingly and willfully engaged in deceptive solicitation and reporting practices and used charitable contributions contrary to the intent of donors.

### *Harm to Donors*

156.   Generous donors contributed more than $187 million to Defendants from 2008 through 2012, believing that their money was going to support legitimate charitable organizations that provided direct aid to cancer patients in the United States.  In fact, the vast majority of contributed funds supported the private interests of for-profit telemarketers or inured to the personal benefit of the Individual Defendants and their family and friends.  Only an insignificant amount of money was actually spent on aid provided to U.S. cancer patients.  Under these circumstances, individual donors were

deceived, and their charitable contributions largely wasted.  In addition, donors had less money available to support the many legitimate charitable organizations operating real programs that help individuals with cancer.

## DEFENDANTS' LAW VIOLATIONS

### Count I

### Misrepresentations that Contributions Were for Charitable Purposes
### (By the FTC and the Plaintiff States)

157.    Plaintiffs incorporate by reference all the foregoing paragraphs.

158.    In numerous instances, in connection with soliciting charitable contributions from donors, Defendants, directly or indirectly, expressly or by implication, have represented that donors' contributions would go to legitimate charitable organizations and be used primarily for charitable programs.

159.    In truth and in fact, donors' contributions have not gone to legitimate charitable organizations and were not used primarily for charitable purposes.  Instead, the contributions have gone to corporate entities controlled by private persons for their individual pecuniary gain and to the for-profit telemarketers they hired, and contributions were not used primarily for charitable programs.

160.    Therefore, the representations described in Paragraph 158 were false and misleading and constituted deceptive practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

161.    The foregoing practices also violate the laws of each Plaintiff State as follows:

| Alabama: | ALA. CODE §§ 13A-9-76(a)(1), (3) and 8-19-5(27). |
|---|---|
| Alaska: | ALASKA STAT. §§ 45.68.050(1) and 45.50.471. |
| Arizona: | ARIZ. REV. STAT. ANN. §§ 44-1522(A) and 44-6561(A)(3). |
| Arkansas: | ARK. CODE ANN. §§ 4-28-412(1) and 4-88-107(a)(7). |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; § 17510.2; § 17510.8; CAL. GOV. CODE §§ 12581 through 12582.1; and § 12599.6. |
| Colorado: | COLO. REV. STAT.  § 6-1-105(1)(hh); and §§ 6-16-111(1)(g) and (i). |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a). |

| Delaware: | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
|---|---|
| Florida: | FLA. STAT. §§ 496.415(7), 496.415(16), 496.416, and 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 43-17-12(d) (2011). |
| Hawaii: | HAW. REV. STAT. §§ 467B-2.1, 467B-9, and 467B-10.5. |
| Idaho: | IDAHO CODE ANN. § 48-1203(1). |
| Illinois: | 225 ILL. COMP. STAT. §§ 460/15(a); 460/15(b)(6); 460/18(b); and 460/9(c). |
| Indiana: | IND. CODE §§ 23-7-8-7(a)(4); and §§ 24-5-0.5-3(b)(1) and (7). |
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1769(b), (h), and (i). |
| Kentucky: | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maine: | ME. REV. STAT. ANN. tit. 5 § 207. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-608, 6-610 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS. ch. 68 § 32 and ch. 93A § 2. |
| Michigan: | MICH. COMP. LAWS § 400.288(f). |
| Minnesota: | MINN. STAT. § 309.55, subd. 5. |
| Mississippi: | MISS. CODE ANN. § 79-11-519(3)(a) and (h). |
| Missouri: | MO. REV. STAT. § 407.020. |
| Montana: | MONT. CODE ANN. § 30-14-103. |
| Nebraska: | NEB. REV. STAT. §§ 59-1602, 87-302(15), and 87-303.01. |
| Nevada: | NEV. REV. STAT. §§ 598.1305 and 598.0915(15). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28-f, I(a), (b), (e). |
| New Jersey: | N.J. STAT. ANN. §§ 45:17A-32(a) and (c); § 56:8-2.7; and N.J. ADMIN. CODE § 13:48-13.2(a). |
| New Mexico: | N.M. STAT. §§ 57-22-6.3(A)(1), (3) and 57-12-3 (1978). |
| New York: | N.Y. EXEC. LAW §§ 63(12) and 172-d.2-4; N.Y. GEN. BUS. LAW § 349; and N.Y. NOT-FOR-PROFIT CORP. LAW § 719. |
| North Carolina: | N.C. GEN. STAT. § 75-1.1; §§ 131F-20(9), (15), and (18); and § 131F-21. |
| North Dakota: | N.D. CENT. CODE §§ 50-22-04.3 and 51-15-02. |
| Ohio: | OHIO REV. CODE ANN. § 1716.14(A). |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 § 552.14a(A)(5). |
| Oregon: | OR. REV. STAT. §§ 128.886 and 646.608(1)(dd). |
| Pennsylvania: | 10 PA. CONS. STAT. § 162.15(a)(2). |
| Rhode Island: | R.I. GEN. LAWS § 5-53.1-7(2). |
| South Carolina: | S.C. CODE ANN. §§ 33-56-120(A) and 33-56-140(C). |

| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21. |
|---|---|
| Tennessee: | TENN. CODE ANN. §§ 48-101-513(a), (b), and (d). |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.46(a), (b)(5), and (b)(24) (West 2014). |
| Utah: | UTAH CODE ANN. §§ 13-11-1 through 13-11-23; §§ 13-22-1 through 13-22-23; and §§ 13-26-1 through 13-26-11. |
| Vermont: | VT. STAT. ANN. tit. 9 §§ 2453 and 2475. |
| Virginia: | VA. CODE ANN. §§ 57-48 and 57-57(L). |
| Washington: | WASH. REV. CODE §§ 19.86.020, 19.09.100(15), and 19.09.340. |
| West Virginia: | W.VA. CODE § 46A-6-101 *et seq.*; W.VA. CODE §§ 29-19-8, -13. |
| Wisconsin: | WIS. STAT. § 202.16(1)(a), formerly § 440.46(1)(a). |
| Wyoming: | WYO. STAT. ANN. §§ 40-12-105(a)(i), (ii), (iii), and (xv). |

## Count II
### Misrepresentations about Program Benefits
### *(By the FTC and the Plaintiff States)*

162.    Plaintiffs incorporate by reference all the foregoing paragraphs.

163.    In connection with soliciting charitable contributions from donors, directly or indirectly, expressly or by implication, Defendants have represented that donors' contributions would be used to fund particular charitable programs.  Such representations have included, but are not limited to, claims that contributed funds would be used to:

a.      Help CFA operate a specific substantial charitable program run by a "national health agency," "on the forefront of the fight against cancer," whose resources are devoted "primarily to direct patient aid" that (1) provides direct assistance to individuals with cancer in the United States and through which it has helped tens of thousands of individuals; and (2) routinely provides pain medications, medical support and services, medical supplies, financial assistance, life-saving items, oxygen, transportation to chemotherapy treatments, medications, and loaned equipment to individuals suffering from cancer and to hospices and other health care nonprofit organizations serving cancer patients;

b.      Help CSS operate a specific substantial charitable program in the United States through which it directly provides aid to cancer patients, hospices, and nonprofit health care organizations, provides hospice care for cancer patients,

and that donations to CSS will be used more efficiently because CSS is a charity and does not use for-profit fundraisers;

      c.    Help CCFOA operate a specific substantial charitable program in the United States through which it provides financial assistance to the families of children with cancer, helps children suffering from cancer with hospice needs, and provides them with medical supplies and pain medication; and

      d.    Help BCS operate specific substantial charitable programs in the United States that (1) provide financial assistance and other direct aid to thousands of individuals suffering from breast cancer; (2) provide individuals suffering from breast cancer with medical supplies, insurance, pain medication, and pay for other specific items; and (3) provide individuals suffering from breast cancer with widely available access to "shopping" experiences through which they can obtain free goods.

164.   In truth and in fact, little or none of the donors' contributions have funded the particular charitable aid described to them, and in numerous instances the donors' contributions were not meaningfully used to:

      a.    Help CFA operate specific substantial charitable programs run by a "national health agency," "on the forefront of the fight against cancer," whose resources were devoted "primarily to direct patient aid" that (1) provided direct assistance to individuals suffering from cancer in the United States and through which it has directly assisted tens of thousands of individuals; and (2) routinely provide pain medications, medical support and services, medical supplies, financial assistance, life-saving items, oxygen, transportation to chemotherapy treatments, medications, and loaned equipment to individuals suffering from cancer and to hospices and other health care nonprofit organizations serving cancer patients;

      b.    Help CSS operate a specific substantial charitable program in the United States through which it has directly provided aid to cancer patients,

hospices, and nonprofit health care organizations, provided hospice care for cancer patients, or used donors' contributions more efficiently because it is a charity;

      c.    Help CCFOA operate a specific substantial charitable program in the United States through which it has provided financial assistance to the families of children suffering from cancer, helped children suffering from cancer with hospice needs, and provided them with medical supplies and pain medication;

      d.    Help BCS operate specific substantial charitable programs in the United States that (1) provided financial assistance and other direct aid to thousands of individuals suffering from breast cancer; (2) provided individuals suffering from breast cancer with medical supplies, insurance, pain medication, and paid for other specific items; and (3) provided individuals suffering from breast cancer with widely available access to "shopping" experiences through which they obtained free goods.

      165.    Therefore, the representations described in Paragraph 163 are false and misleading and constitute deceptive practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

      166.    The foregoing practices also violate the laws of each Plaintiff State as follows:

| Alabama: | ALA. CODE §§ 13A-9-76(a)(1), (3) and 8-19-5(27). |
|---|---|
| Alaska: | ALASKA STAT. §§ 45.68.050(1) and 45.50.471. |
| Arizona: | ARIZ. REV. STAT. ANN. § 44-1522(A) and 44-6561(A)(3). |
| Arkansas: | ARK. CODE ANN. §§ 4-28-412(1) and 4-88-107(a)(7). |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; §§ 17510.2 and 17510.8; CAL. GOV. CODE §§ 12581 through 12582.1; § 12599.6. |
| Colorado: | COLO. REV. STAT. § 6-1-105(1)(hh); and §§ 6-16-111(1)(g) and (i). |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a). |
| Delaware: | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida: | FLA. STAT. §§ 496.415(7), 496.415(16), 496.416, and 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 43-17-12(d) (2011). |
| Hawaii: | HAW. REV. STAT. §§ 467B-2.1, 467B-6.5, 467B-9, and 467B-10.5. |

| Idaho: | IDAHO CODE ANN. § 48-1203(1). |
|---|---|
| Illinois: | 225 ILL. COMP. STAT. §§ 460/15(a); 460/15(b)(6); 460/18(b); and 460/9(c). |
| Indiana: | IND. CODE §§ 23-7-8-7(a)(4); and §§ 24-5-0.5-3(b)(1) and (7). |
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1769(b), (h), and (i). |
| Kentucky: | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maine: | ME. REV. STAT. ANN. tit. 5 § 207. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-608, 6-610 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS ch. 68 § 32 and ch. 93A § 2. |
| Michigan: | MICH. COMP. LAWS §§ 400.288(j) and (o). |
| Minnesota: | MINN. STAT. § 309.55, subd. 5. |
| Mississippi: | MISS. CODE ANN. §§ 79-11-519(3)(a) and (h). |
| Missouri: | MO. REV. STAT. § 407.020. |
| Montana: | MONT. CODE ANN. § 30-14-103. |
| Nebraska: | NEB. REV. STAT. §§ 59-1602, 87-302(15), and 87-303.01. |
| Nevada: | NEV. REV. STAT. §§ 598.1305 and 598.0915(15). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28-f, I(a), (b), (e). |
| New Jersey: | N.J. STAT. ANN. §§ 45:17A-32(a), 45:17A-32 (c), 56:8-2.7; and N.J. ADMIN. CODE § 13:48-13.2(a). |
| New Mexico: | N.M. STAT. §§ 57-22-6.3(A)(1), (3) and 57-12-3 (1978). |
| New York: | N.Y. EXEC. L. § 63(12); § 172-d.2-4; and N.Y. GEN. BUS. L. § 349. |
| North Carolina: | N.C. GEN. STAT. §§ 75-1.1; 131F-20(9), (15), and (18); and § 131F-21. |
| North Dakota: | N.D. CENT. CODE §§ 50-22-04.3 and 51-15-02. |
| Ohio: | OHIO REV. CODE ANN. § 1716.14(A). |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 § 552.14a(A)(5). |
| Oregon: | OR. REV. STAT. §§128.886 and 646.608(1)(dd). |
| Pennsylvania: | 10 PA. CONS. STAT. § 162.15(a)(2). |
| Rhode Island: | R.I. GEN. LAWS § 5-53.1-7(2). |
| South Carolina: | S.C. CODE ANN. §§ 33-56-120(A) and 33-56-140(C). |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21. |
| Tennessee: | TENN. CODE ANN. §§ 48-101-513(a), (b) and (d). |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.46(a), (b)(5), and (b)(24) (West 2014). |
| Utah: | UTAH CODE ANN. §§ 13-22-1 through 13-22-23; 13-26-1 through 13-26-11; and 13-11-1 through 13-11-23. |
| Vermont: | VT. STAT. ANN. tit. 9 §§ 2453 and 2475. |
| Virginia: | VA. CODE ANN. §§ 57-48 and 57-57(L). |

| Washington: | WASH. REV. CODE §§ 19.86.020, 19.09.100(15), and 19.09.340. |
| West Virginia: | W.VA. CODE § 46A-6-101 *et seq.*; W.VA. CODE §§ 29-19-8, -13. |
| Wisconsin: | WIS. STAT. § 202.16(1)(a), formerly § 440.46(1)(a). |
| Wyoming: | WYO. STAT. ANN. § 40-12-105(a)(xv). |

**Count III**
**Misrepresentations about Revenue and Program Expenses**
**Related to International GIK Shipments**
***(By the FTC and the Plaintiff States)***

167.   Plaintiffs incorporate by reference all the foregoing paragraphs.

168.   In public statements, documents submitted to the Combined Federal Campaign, and financial documents and Forms 990 filed with state regulators and the IRS, Defendants have made representations regarding their total revenues and program expenses, including revenues and program expenses associated with shipments of GIK goods to developing countries.  In connection with such international GIK transactions, in numerous instances, Defendants have represented that:

    a.   their reported contributed revenues included the value of GIK goods that Defendants received as donations and subsequently owned;

    b.   their reported program expenses included the value of GIK goods that Defendants distributed to organizations in developing countries; and

    c.   the values of the GIK goods reported as contributed revenue and program expenses accurately reflected the fair value of the GIK goods measured under appropriate applicable accounting standards.

169.   In truth and in fact, in numerous instances in connection with such international GIK transactions:

    a.   Defendants neither received nor took ownership of the GIK goods and therefore should not have reported their value as contributed revenue;

    b.   because Defendants did not own the GIK goods they claimed to distribute to organizations in developing countries, they should not have reported the value of such GIK goods as program expenses; and

c.      the reported values of the GIK goods did not accurately reflect the fair value of the goods measured under appropriate applicable accounting standards.

Defendants used these misrepresentations to appear larger, more charitable, and more efficient with donors' contributions than the Defendants actually were, misleading donors, regulators, and others.

170.    Therefore, the acts and practices described in Paragraph 168 constitute deceptive practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

171.    The foregoing practices also violate the laws of each Plaintiff State as follows:

| | |
|---|---|
| Alabama: | ALA. CODE §§ 13A-9-76(a)(3-4). |
| Alaska: | ALASKA STAT. § 45.68.010(g). |
| Arizona: | ARIZ. REV. STAT. ANN. § 44-1522(A). |
| Arkansas: | ARK. CODE ANN. §§ 4-28-412(1), 4-28-412(2), 4-28-412(8), and 4-88-107(a)(7). |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; CAL. GOV. CODE §§ 12581 through 12582.1; § 12599.6. |
| Colorado: | COLO. REV. STAT. § 6-1-105(1)(hh); §§ 6-16-111(1)(f) and(g). |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a). |
| Delaware: | DEL. CODE ANN. tit. 6, §§ 2513(a) and 2532(a)(12). |
| Florida: | FLA. STAT. §§ 496.415(2), 496.416, and 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 43-17-12(b) (2011). |
| Hawaii: | HAW. REV. STAT. §§ 467B-2.1, 467B-6.5, 467B-9, and 467B-10.5. |
| Idaho: | IDAHO CODE ANN. § 48-1203(1). |
| Illinois: | 225 ILL. COMP. STAT. §§ 460/15(a); 460/15(b)(6); 460/18(b); and 460/9(c). |
| Indiana: | IND. CODE § 24-5-0.5-3(b)(1). |
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1769(b) and (h). |
| Kentucky: | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maine: | ME. REV. STAT. ANN. tit. 5 § 207. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-608, 6-613 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS ch. 12 § 8F; ch. 68 §§ 19, 32; and ch. 93A § 2. |
| Michigan: | MICH. COMP. LAWS § 400.288(u)(ii). |

| Minnesota: | MINN. STAT. § 309.53, subd. 3 and § 309.55, subd. 5. |
| Mississippi | MISS. CODE ANN. § 79-11-519(3)(d). |
| Missouri: | MO. REV. STAT. § 407.020. |
| Montana: | MONT. CODE ANN. § 30-14-103. |
| Nebraska: | NEB. REV. STAT. §§ 59-1602, 87-302(15), and 87-303.01. |
| Nevada: | NEV. REV. STAT. §§ 598.1305 and 598.0915(15). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28-f, I (a), (b), (e). |
| New Jersey: | N.J. STAT. ANN. § 45:17A-33(b)(1); § 56:8-2.7; and N.J. ADMIN CODE §§ 13:48-13.3(a)(1). |
| New Mexico: | N.M. STAT. §§ 57-22-6.3(A)(1) and (3); and § 57-12-3 (1978). |
| New York: | N.Y. EXEC. L. §§ 63(12) and 172-d.1-4; and N.Y. GEN. BUS. L. § 349. |
| North Carolina: | N.C. GEN. STAT. § 75-1.1; §§ 131F-20 (9), (15), and (18); and § 131F-21. |
| North Dakota: | N.D. CENT. CODE §§ 51-15-02 and 50-22-04.3. |
| Ohio: | OHIO REV. CODE ANN. § 1716.14(A). |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 § 552.14a(A)(1) and (5). |
| Oregon: | OR. REV. STAT. §§ 128.886 and 646.608(1)(dd). |
| Pennsylvania: | 10 PA. CONS. STAT. § 162.15(a)(2). |
| Rhode Island: | R.I. GEN. LAWS § 5-53.1-7(2). |
| South Carolina: | S.C. CODE ANN. §§ 33-56-120(A) and 33-56-140(C). |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21. |
| Tennessee: | TENN. CODE ANN. §§ 48-101-504(a), 48-101-509(a)(1), and 48-101-513(b). |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.46(a), (b)(1), (b)(5), and (b)(24) (West 2014). |
| Utah: | UTAH CODE ANN. § 13-22-15; see also UTAH ADMIN. CODE R152-22-4; accord UTAH CODE ANN. § 13-22-1(b)(ix). |
| Vermont: | VT. STAT. ANN. tit. 9 § 2453 and 2475. |
| Virginia: | VA. CODE ANN. §§ 57-48 and 57-57(L). |
| Washington: | WASH. REV. CODE §§ 19.86.020, 19.09.100(15), and 19.09.340. |
| West Virginia: | W.VA. CODE § 46A-6-101 et seq.; W.VA. CODE §§ 29-19-8, -13. |
| Wisconsin: | WIS. STAT. § 202.16(1)(a), formerly § 440.46(1)(a). |
| Wyoming: | WYO. STAT. ANN. §§ 40-12-105(a)(iii) and (xv). |

**Count IV**
**Misrepresentations about Programs Related to International GIK**
*(By the FTC and the Plaintiff States)*

172.   Plaintiffs incorporate by reference all the foregoing paragraphs.

173.   In numerous instances, in connection with soliciting charitable contributions from donors, Defendants have represented, directly or through telemarketers, expressly or by implication, that the primary focus of their charitable programs was to provide direct assistance within the United States to individuals with cancer, children with cancer, or individuals with breast cancer.

174.   In truth and in fact, using Corporate Defendants' reported valuations, the vast majority of the aid that Corporate Defendants claimed to provide was related to the shipment of GIK goods to organizations in developing countries whose use of the goods was not restricted to assisting individuals with cancer and who did not in fact use the goods primarily to assist individuals with cancer.

175.   Therefore, the acts and practices described in Paragraph 173 constitute deceptive practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

176.   The foregoing practices also violate the laws of the Plaintiff States as follows:

| | |
|---|---|
| Alabama: | ALA. CODE §§13A-9-76(a)(3-4). |
| Alaska: | ALASKA STAT. §§ 45.68.050(1) and 45.50.471. |
| Arizona: | ARIZ. REV. STAT. ANN. § 44-1522(A). |
| Arkansas: | ARK. CODE ANN. §§ 4-28-412(1) and 4-88-107(a)(7). |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; CAL. GOV. CODE §§ 12581 through 12582.1; § 12599.6. |
| Colorado: | COLO. REV. STAT. § 6-1-105(1)(hh); and §§ 6-16-111(1)(g) and (i). |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a). |
| Delaware: | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida: | FLA. STAT. §§ 496.415(7), 496.416, and 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 43-17-12(d) (2011). |

| | |
|---|---|
| Hawaii: | HAW. REV. STAT. §§ 467B-2.1, 467B-6.5, 467B-9, and 467B-10.5. |
| Idaho: | IDAHO CODE ANN. § 48-1203(1). |
| Illinois: | 225 ILL. COMP. STAT. §§ 460/15(a); 460/15(b)(6); 460/18(b); and 460/9(c). |
| Indiana: | IND. CODE §§ 23-7-8-7(a)(4); and §§ 24-5-0.5-3(b)(1) and (7). |
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1769(b) and (h). |
| Kentucky: | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maine: | ME. REV. STAT. ANN. tit. 5 § 207. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-608, 6-610 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS ch. 68 § 32 and ch. 93A § 2. |
| Michigan: | MICH. COMP. LAWS § 400.288(n). |
| Minnesota: | MINN. STAT. § 309.55, subd. 5. |
| Mississippi: | MISS. CODE ANN. §§79-11-519(3)(a) and (h). |
| Missouri: | MO. REV. STAT. § 407.020. |
| Montana: | MONT. CODE ANN. § 30-14-103. |
| Nebraska: | NEB. REV. STAT. §§ 59-1602, 87-302(15), and 87-303.01. |
| Nevada: | NEV. REV. STAT. §§ 598.1305; and 598.0915(15). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28-f, I(a), (b), (e). |
| New Jersey: | N.J. STAT. ANN. §§ 45:17A-32(a), 45:17A-32(c), 56:8-2.7; and N.J. ADMIN. CODE § 13:48-13.2(a). |
| New Mexico: | N.M. Stat. §§ 57-22-6.3(A)(1) and (3); and § 57-12-3 (1978). |
| New York: | N.Y. EXEC. L. §§ 63(12) and 172-d.2-4; N.Y. GEN. BUS. L. § 349. |
| North Carolina: | N.C. GEN. STAT. § 75-1.1; §§ 131F-20(9), (15), and (18); and § 131F-21. |
| North Dakota: | N.D. CENT. CODE §§ 51-15-02 and 50-22-04.3. |
| Ohio: | OHIO REV. CODE ANN. § 1716.14(A). |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 § 552.14a(A)(5). |
| Oregon: | OR. REV. STAT. §§ 128.886 and 646.608(1)(dd). |
| Pennsylvania: | 10 PA. CONS. STAT. § 162.15(a)(2). |
| Rhode Island: | R.I. GEN. LAWS § 5-53.1-7(2). |
| South Carolina: | S.C. CODE ANN. §§ 33-56-120(A) and 33-56-140(C). |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21. |
| Tennessee: | TENN. CODE ANN. § 48-101-513(b). |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.46(a), (b)(4), (b)(5), (b)(7), and (b)(24) (West 2014). |
| Utah: | UTAH CODE ANN. §§ 13-22-12(1)(b)(v), -13(3); 13-26-11(1)(c); 13-11-4(2)(a), (i), (o). |
| Vermont: | VT. STAT. ANN. tit. 9 § 2453 and 2475. |

| Virginia: | VA. CODE ANN. §§ 57-48 and 57-57(L). |
| Washington: | WASH. REV. CODE §§ 19.86.020, 19.09.100(15), and 19.09.340. |
| West Virginia: | W.VA. CODE § 46A-6-101 *et seq.*; and §§ 29-19-8, -13. |
| Wisconsin: | WIS. STAT. § 202.16(1)(a), formerly § 440.46(1)(a). |
| Wyoming: | WYO. STAT. ANN. §§ 40-12-105(a)(i), (ii), (iii), and (xv). |

### Count V

#### False and Misleading Filings with State Charities Regulators
*(By the Plaintiff States Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Virginia, Washington, and West Virginia) (collectively, the "charging Plaintiff States")*

177.    Plaintiffs incorporate by reference all the foregoing paragraphs.

178.    As required by law, each of the Corporate Defendants filed financial statements, often certified under penalty of perjury, with the charging Plaintiff States.  In some instances, to satisfy state law requirements, Defendants filed their Forms 990 together with certain transmittal information; in others, Defendants filed reports cross-referencing to or summarizing the information on their Forms 990; and in other instances, with certain states, Defendants filed full audited financial statements.  The charging Plaintiff States disseminated or otherwise made available the financial information contained in those filings to the public.  Together with the public, state charities regulators relied on the financial information submitted in evaluating the performance and effectiveness of the Corporate Defendants.

179.    For each of the years 2008 through 2012, the financial information filed by each of the Corporate Defendants with the charging Plaintiff States included materially false and misleading information about certain international GIK transactions, including, in numerous instances:

a.    the Corporate Defendants' annual revenues included the value of certain GIK goods that they had received as donations and owned; and

b.     the Corporate Defendants' annual program expenses included the value of certain GIK goods that the Corporate Defendants distributed to recipients in developing countries.

180.   In truth and in fact, in numerous instances in connection with certain international GIK transactions:

a.     the Corporate Defendants did not own the GIK goods they reported receiving as donations and their reported annual revenues should not have included the value of those GIK goods; and

b.     the Corporate Defendants did not own the GIK goods that they claimed to have distributed to recipients in developing countries and their reported annual program expenses should not have included the value of such GIK goods. Through these false statements, the Corporate Defendants disseminated to the public false and misleading depictions of their operations and their effectiveness.

181.   The Corporate Defendants certified, in many instances under penalty of perjury, that the financial information they filed was true and accurate.  The Individual Defendants, including those who signed certifications attesting to the truth and accuracy of the Corporate Defendants' filings, knew that these filings were false and misleading.

182.   In filing and causing to be filed false and misleading financial statements, Defendants have violated the laws of the charging Plaintiff States as follows:

| Alabama: | ALA. CODE § 13A-9-76(a)(4). |
|---|---|
| Alaska: | ALASKA STAT. §§ 45.68.010(g), 45.68.050(1), and 45.50.471. |
| Arkansas: | ARK. CODE ANN. § 4-28-412(8). |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; CAL. GOV. CODE §§ 12581 through 12582.1; and § 12599.6. |
| Colorado: | COLO. REV. STAT. § 6-1-105(1)(hh); and §§ 6-16-111(1)(f) and (g). |
| Connecticut: | CONN. GEN. STAT. § 21a-190h. |
| Florida: | FLA. STAT. §§ 496.415(2), 496.416 and 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 43-17-12(b) (2011). |
| Hawaii: | Haw. Rev. Stat. §§ 467B-2.1, 467B-6.5, 467B-9, and 467B-10.5. |

| Illinois: | 225 Ill. Comp. Stat. §§ 460/15(a); 460/15(b)(6); and 460/9(c). |
|---|---|
| Kansas: | Kan. Stat. Ann. §§ 17-1769(a), (b), (c). |
| Kentucky: | Ky. Rev. Stat. Ann. § 367.170(1). |
| Louisiana: | La. Rev. Stat. Ann. §§ 51:1405 and 51:1905. |
| Maryland: | Md. Code Ann., Bus. Reg. §§ 6-608, 6-613 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | Mass. Gen. Laws ch. 12 § 8F and ch. 68 §§ 19, 32. |
| Michigan: | Mich. Comp. Laws § 400.288(y). |
| Minnesota: | Minn. Stat. §§ 309.53, subd. 3 and 309.55, subd. 5. |
| Mississippi: | Miss. Code Ann. § 79-11-519(3)(d). |
| New Hampshire: | N.H. Rev. Stat. Ann. §§ 7:28-f, I(a), (b), and (e); 7:28-f, II(a), (c), (d) and (e); and 641:8. |
| New Jersey: | N.J. Stat. Ann. §§ 45:17A-33(b)(1) and 56:8-2.7; and N.J. Admin. Code § 13:48-13.3(a)(1). |
| New Mexico: | N.M. Stat. Ann. §§ 57-22-6.3(A)(1), (3); and § 57-12-3 (1978). |
| New York: | N.Y. Exec. L. §§ 63(12), 172-b.2, and 172-d.1-2; N.Y. Gen. Bus. L. § 349. |
| North Carolina: | N.C. Gen. Stat. § 75-1.1; §§ 131F-20 (9), (15), and (18); and § 131F-21. |
| North Dakota: | N.D. Cent. Code §§ 50-22-01 through 50-22-07. |
| Ohio: | Ohio Rev. Code Ann. § 1716.14(A). |
| Oklahoma: | Okla. Stat. Ann. tit. 18 § 552.14a(A)(1). |
| Oregon: | Or. Rev. Stat. § 128.886 and Or. Rev. Stat. § 646.608(1)(dd). |
| Pennsylvania: | 10 Pa. Cons. Stat. § 162.15(a)(2). |
| Rhode Island: | R.I. Gen. Laws § 5-53.1-7(1). |
| South Carolina: | S.C. Code Ann. §§ 33-56-120(A) and 33-56-140(C). |
| Tennessee: | Tenn. Code Ann. § 48-101-504(a). |
| Utah: | Utah Code Ann. §§ 13-22-12(1)(a), -15. |
| Virginia: | Va. Code Ann. § 57-57(O). |
| Washington: | Wash. Rev. Code §§ 19.86.020, 19.09.071, 19.09.075(h), and 19.09.340 |
| West Virginia: | W.Va. Code § 29-19-1 et seq. |

## Count VI
### Means and Instrumentalities of Deception by CFA, CCFOA, & BCS
*(By the Federal Trade Commission and Plaintiff States Alabama, Alaska, California, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Pennsylvania, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, and West Virginia) (collectively, the "charging Plaintiff States")*

183.   Plaintiffs incorporate by reference all the foregoing paragraphs.

184.   In numerous instances, in connection with soliciting charitable contributions from donors, CFA, CCFOA, and BCS, individually or in concert with others, have provided telemarketers with the means and instrumentalities to deceive donors.  The means and instrumentalities that CFA, CCFOA, and BCS have provided include, but are not limited to, affiliation with a purported charitable organization in whose name solicitations can be made and telemarketing scripts and other solicitation materials, such as brochures, donor invoices, and thank you letters that make misrepresentations about the purported programs of CFA, CCFOA, and BCS.

185.   By providing the means and instrumentalities to others for the commission of deceptive acts and practices as described in Paragraph 184, Defendants have violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

186.   The foregoing practices also violate the laws of the charging Plaintiff States as follows:

| | |
|---|---|
| Alabama: | ALA. CODE § 8-19-5(27) and § 13A-9-76(a)(3). |
| Alaska: | ALASKA STAT. §§ 45.68.050(1) and 45.50.471. |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; CAL. GOV. CODE §§ 12581 through 12582.1, 12599.6. |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190h and 42-110b(a). |
| Delaware: | DEL. CODE ANN. tit. 6, §§ 2513(a), 2532(a)(12), and 2595(a), (b)(4) and (6). |
| Florida: | FLA. STAT. § 501.204(1) (2013). |
| Georgia: | GA. CODE ANN. § 10-1-393 (2012). |
| Idaho: | IDAHO CODE § 48-1203(1). |
| Illinois: | 225 ILL. COMP. STAT. § 460/9(c). |

| Indiana: | IND. CODE §§ 23-7-8-7(a)(4); and §§ 24-5-0.5-3(b)(1) and (7). |
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1764, 17-1765, 17-1766, and 17-1769(b),(c), and (e). |
| Kentucky: | KY. REV. STAT. ANN. § 367.170(1). |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1405 and 51:1905. |
| Maryland: | MD. CODE ANN., BUS. REG. §§ 6-607, 6-608 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS. ch. 68 § 32 and ch. 93A § 2. |
| Michigan: | MICH. COMP. LAWS § 400.288(q). |
| Minnesota: | MINN. STAT. § 309.55, subd. 5. |
| Montana: | MONT. CODE ANN. § 30-14-103. |
| Nebraska: | NEB. REV. STAT. §§ 59-1602, 87-302(15), and 87-303.01. |
| Nevada: | NEV. REV. STAT. §§ 598.1305 and 598.0915(15). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28-f, I(a), (b), (c), and (e). |
| New Jersey: | N.J. STAT. ANN. §§ 56:8-2.7, 45:17A-32(a), 45:17A-32 (c); and N.J. ADMIN. CODE § 13:48-13.2(a). |
| New Mexico: | N.M. STAT. §§ 57-22-6.3(A)(1), (3); §§ 57-22-8(A), (B); and § 57-12-3 (1978). |
| New York: | NY EXEC. L. §§ 63(12) and 172-d.1-3; N.Y. GEN'L BUS. L. § 349. |
| North Carolina: | N.C. GEN. STAT. § 75-1.1. |
| North Dakota: | N.D. CENT. CODE §§ 50-22-01 through 50-22-07; and §§ 51-15-01 through 51-15-11. |
| Ohio: | OHIO REV. CODE ANN. § 1716.14(A). |
| Pennsylvania: | 10 P.S. § 162.15(a)(2). |
| South Carolina: | S.C. CODE ANN. §§ 33-56-120(A) and 33-56-140(C). |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21. |
| Texas: | TEX. BUS. & COM. CODE ANN. § 17.46(a) (WEST 2014). |
| Utah: | UTAH CODE ANN. § 13-26-3(5): see also UTAH ADMIN. CODE R152-26-5(3)(a). |
| Virginia: | VA. CODE ANN. §§ 57-48 and 57-57(L). |
| Washington: | WASH. REV. CODE §§ 19.86.020, 19.09.100(15), and 19.09.340. |
| West Virginia: | W.VA. CODE § 29-19-13 and § 46A-6-101 et seq. |

## VIOLATIONS OF THE TELEMARKETING SALES RULE

187.   Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101 - 6108, in 1994.  On August 16, 1995, the FTC adopted the Telemarketing Sales Rule (the "Original TSR"), 16 C.F.R. Part 310, which became effective on December 31,

1    1995.  On January 29, 2003, the FTC amended the Original TSR by issuing a Statement

2    of Basis and Purpose and the final amended Telemarketing Sales Rule (the "TSR").  68

3    Fed. Reg. 4580, 4669.

4         188.    The Telemarketing Act also authorizes attorneys general to initiate federal

5    district court proceedings to enjoin telemarketing activities that violate the TSR, and in

6    each such case, to obtain damages, restitution and other compensation on behalf of their

7    residents.  15 U.S.C. § 6103(a).

8         189.    The TSR defines "charitable contribution" to mean "any contribution or gift

9    of money or any other thing of value."  16 C.F.R. § 310.2(f).

10        190.    The TSR defines "donor" to mean "any person solicited to make a

11   charitable contribution."  16 C.F.R. § 310.2(m).

12        191.    The TSR defines "telemarketer" to mean "any person who, in connection

13   with telemarketing, initiates or receives telephone calls from a customer or donor."

14   16 C.F.R. § 310.2(bb).

15        192.    The TSR defines "telemarketing" to mean "a plan, program, or campaign

16   which is conducted to induce the purchase of goods or services or a charitable

17   contribution, by use of one or more telephones and which involves one or more interstate

18   telephone call."  16 C.F.R. § 310.2(cc).

19        193.    The TSR prohibits any person from providing substantial assistance or

20   support to any seller or telemarketer when that person knows or consciously avoids

21   knowing that the seller or telemarketer is engaged in any practice that violates Sections

22   310.3(a), (c), or (d) or 310.4 of the Rule.  16 C.F.R. § 310.3(b).

23        194.    The TSR prohibits telemarketers from making a false or misleading

24   statement to induce a charitable contribution.  16 C.F.R. Part 310.3(a)(4).

25        195.    The TSR prohibits, inter alia, telemarketers from misrepresenting, directly

26   or by implication, the nature, purpose, or mission of an entity on behalf of which a

27   charitable contribution is being requested; the purpose for which any charitable

28   contribution will be used; the percentage or amount of any charitable contribution that

will go to a charitable organization or any particular charitable program; and a charitable organization's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.  16 C.F.R. § 310.3(d)(1), (3), (4), and (6).

### Count VII
### Assisting & Facilitating Telemarketing Violations by CFA, CCFOA, & BCS
*(By Plaintiffs Federal Trade Commission and the Attorneys General of the Plaintiff States and the District of Columbia)*

196.   Plaintiffs incorporate by reference all the foregoing paragraphs.

197.   In numerous instances, in connection with soliciting charitable contributions by telephone, CFA, CCFOA, and BCS have provided substantial assistance or support to telemarketers while knowing or consciously avoiding knowing that the telemarketers were engaged in acts or practices that violate Sections 310.3(a) (4) and 310.3(d)(1), (3), (4), and (6) of the TSR, thereby violating Section 310.3(b) of the TSR. 16 C.F.R. § 310.3(b).

### Count VIII
### Telemarketing Misrepresentations by Defendant CSS
*(By Plaintiffs Federal Trade Commission and the Attorneys General of the Plaintiff States and the District of Columbia)*

198.   Plaintiffs incorporate by reference all the foregoing paragraphs.

199.   In numerous instances, in connection with soliciting charitable contributions by telephone, CSS has made false or misleading statements to induce a charitable contribution, including:

    a.   misrepresenting, directly or by implication, the nature, purpose, or mission of an entity on behalf of which a charitable contribution is being requested;

    b.   the purpose for which any charitable contribution will be used; and

    c.   the percentage or amount of any charitable contribution that will go to a charitable organization or any particular charitable program.

CSS has thereby violated Sections 310.3(a)(4) and 310.3(d)(1), (3), and (4) of the TSR. 16 C.F.R. § 310.3(a) (4) and 310.3(d) (1), (3), and (4).

## INJURY

200.    Donors have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and state law.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure donors, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

201.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

202.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Sections 4(a) and 6(b) of the Telemarketing Act, 15 U.S.C. §§ 6103(a) and 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission and reformation of contracts, and the refund of money.

203.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow the Plaintiff States to enforce their state laws against Defendants in this Court and to grant such relief as provided under the following state laws including injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, removal of officers and directors, civil penalties,

1  attorneys' fees, expenses, costs, and such other relief to which the Plaintiff States may be
2  entitled:

3

| | |
|---|---|
| Alabama: | ALA. CODE §§ 8-19-8 and 13A-9-76(a-b). |
| Alaska: | ALASKA STAT. §§ 45.50.501, 45.50.537, and 45.50.551. |
| Arizona: | ARIZ. REV. STAT. ANN. §§ 44-1528, 44-1531, and 44-1534. |
| Arkansas: | ARK. CODE ANN. §§ 4-28-416 and 4-88-113. |
| California: | CAL. BUS. & PROF. CODE §§ 17200 through 17206; CAL. GOV. CODE §§ 12586.2, 12591, 12591.1, 12597, and 12598. |
| Colorado: | COLO. REV. STAT. §§ 6-1-110, 112 and 113(4); §§ 6-16-111(5) and 6-16-111(6)(c). |
| Connecticut: | CONN. GEN. STAT. §§ 21a-190l and 42-110m(a). |
| Delaware: | DEL. CODE ANN. tit. 6, §§ 2522 through 2526, 2533, and 2597; and tit. 29, §§ 2520 and 2522. |
| Florida: | FLA. STAT. §§ 496.416, 501.207, and 501.2075 (2013). |
| Georgia: | GA. CODE ANN. §§ 43-17-13 through 43-17-14 (2011). |
| Hawaii: | HAW. REV. STAT. § 28-5.2; §§ 467B-9.6, 467B-9.7(d), and 467B-10.5; and § 480-15. |
| Idaho: | IDAHO CODE ANN. §§ 48-606(1), 48-607, and 48-1204. |
| Illinois: | 225 ILL. COMP. STAT. §§ 460/9(f), 9(g), 9(h), and 9(j); 460/15(b)(6) and 15(c); 460/16(a) and 16(b); 460/18(g); and 460/9(c). |
| Indiana: | IND. CODE §§ 23-7-8-8; and 24-5-0.5-4 and -8. |
| Iowa: | IOWA CODE § 714.16. |
| Kansas: | KAN. STAT. ANN. §§ 17-1768, 17-1773(a), and 17-1776. |
| Kentucky: | KY. REV. STAT. ANN. §§ 367.190(1), 367.190(3), 367.200, 367.210, 367.990(2), and 367.665. |
| Louisiana: | LA. REV. STAT. ANN. §§ 51:1403, 51:1407, 51:1408, and 51:1416. |
| Maine: | ME. REV. STAT. ANN. tit. 5 § 209 and tit. 14 § 1522(1)(A); and M.R. Civ. P. 65. |
| Maryland: | MD. CODE ANN., BUS. REG. § 6-205 (2010 Repl. Vol.) (2014 Suppl.). |
| Massachusetts: | MASS. GEN. LAWS ch. 12 § 8F; ch. 68 § 32; and ch. 93A § 4. |
| Michigan: | MICH. COMP. LAWS § 400.290. |
| Minnesota: | MINN. STAT. § 8.31, subds. 1 and 309.57. |
| Mississippi: | MISS. CODE ANN. §§ 79-11-509(4) and (6). |
| Missouri: | MO. REV. STAT. § 407.020. |
| Montana: | MONT. CODE ANN. §§ 30-14-131, 30-14-142, and 30-14-144. |

| Nebraska: | NEB. REV. STAT. §§ 21-1977, 21-19,142(c), 21-19,143, 59-1608, 59-1609, 59-1614, 87-303, 87-303.05, 87-303.07, and 87-303.11. |
| Nevada: | NEV. REV. STAT. §§ 598.0999(1) through (4), and (6). |
| New Hampshire: | N.H. REV. STAT. ANN. §§ 7:28, II(c) through 7:28, II(g). |
| New Jersey: | N.J. STAT. ANN. §§ 45:17A-33(d-e), 56:8-8, 56:8-9, 56:8-11, 56:8-13, and 56:8-19; and N.J. ADMIN. CODE § 13:48-14.1. |
| New Mexico: | N.M. STAT. §§ 57-22-9(A), (B); 57-22-9.1(J); 57-12-8; and 57-12-11 (1978). |
| New York: | N.Y. EXEC. LAW §§ 63(12), 175; and N.Y. NOT-FOR-PROFIT CORP. LAW § 112. |
| North Carolina: | N.C. GEN. STAT. §§ 75-14 through 75-15.2; §§ 75-16.1; and § 131F-24(a). |
| North Dakota: | N.D. CENT. CODE §§ 51-15-07, 51-15-08, 51-15-10, 51-15-11, 50-22-05, and 50-22-06. |
| Ohio: | OHIO REV. CODE ANN. § 1716.16. |
| Oklahoma: | OKLA. STAT. ANN. tit. 18 § 552.14a(D)(1)-(6), (H), (I). |
| Oregon: | OR. REV. STAT. §§ 646.632 and 646.636. |
| Pennsylvania: | 10 PA. CONS. STAT. § 162.19. |
| Rhode Island: | R.I. GEN. LAWS §§ 5-53.1 through 5-53.1-18. |
| South Carolina: | S.C. CODE ANN. § 33-56-140(C). |
| South Dakota: | S.D. CODIFIED LAWS §§ 37-30-17 through 37-30-21; and §§ 21-34-1 through 21-34-14. |
| Tennessee: | TENN. CODE ANN. §§ 48-101-514(a)(1) and 48-101-514(c). |
| Texas: | TEX. BUS. & COM. CODE ANN. §§ 17.47(a), (c), and (d) (West 2014); and TEX. GOV'T CODE § 402.006(c) (West 2014). |
| Utah: | UTAH CODE ANN. § 13-2-5(3); §§ 13-22-3(4)(a), (c) through (g); and §§ 13-11-17, 13-11-17.5, 13-26-8(2), and 13-26-10. |
| Vermont: | VT. STAT. ANN. tit. 9 §§ 2458, 2459, 2460, 2461, and 2475. |
| Virginia: | VA. CODE ANN. §§ 57-59(D) and (E). |
| Washington: | WASH. REV. CODE §§ 19.86.020, 19.86.080, 19.86.140, and 19.09.340. |
| West Virginia: | W.VA. CODE § 46A-7-101 et seq.; W.VA. CODE §§ 29-19-15, -15a, and -15b. |
| Wisconsin: | WIS. STAT. § 202.18(1)(b). |
| Wyoming: | WYO. STAT. ANN. §§ 40-12-106, 111, and 113. |

## **PRAYER FOR RELIEF**

WHEREFORE, the FTC, the Plaintiff States, and the District of Columbia respectfully request that the Court:

A.     Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of donor injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, a preliminary injunction, removal of the corporate officers and directors of each Corporate Defendant, an accounting of assets, and appointment of a receiver;

B.     Enter a permanent injunction to prevent Defendants from future violations of the FTC Act, state law, and the TSR;

C.     Award such relief as the Court finds necessary to redress injury to donors resulting from Defendants' violations of the FTC Act, state laws, and the TSR, including, but not limited to, removal of the corporate officers and directors, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D.     Award Plaintiffs the costs of bringing this action, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper; and

E.     Award Plaintiff States civil penalties for each violation of their respective state laws, attorneys' fees, and expenses as provided under state law.

/

/

/

/

/

/

/

/

/

1   Respectfully Submitted,

2

3          **FOR THE FEDERAL TRADE COMMISSION:**

4

5          Jonathan E. Nuechterlein

6          General Counsel
            CHARLES A HARWOOD

7          Regional Director

8

9          By: _Tracy Thorleifson_

10

11         Tracy S. Thorleifson
           Sophie H. Calderón,

12        Krista K. Bush, and

13        Connor Shively
           Attorneys

14        Federal Trade Commission

15        915 2nd Ave., Suite 2896
           Seattle, WA  98174

16        Email: tthorleifson@ftc.gov

17               scalderon@ftc.gov

18               kbush@ftc.gov
                cshively@ftc.gov

19        Telephone: (206) 220-6350
           Attorneys for Plaintiff Federal Trade Commission

20

21        Signed _May 15_ , 2015

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR THE STATE OF ALABAMA**
By: _____
Kyle Beckman (AL Bar #ASB-6046-E63B)*
**Assistant Attorney General**
**Office of Attorney General Luther Strange**
**501 Washington Avenue**
**Montgomery, AL 36104-0152**
kbeckman@ago.state.al.us
Telephone:   (334) 353-2619
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Alabama*
Signed ____05/12____, 2015

**FOR THE STATE OF ALASKA**

By: _____

Cynthia Drinkwater, Alaska Bar No. 8808159*
Assistant Attorney General
Office of Attorney General Craig W. Richards
1031 W. 4th Ave, Suite 200
Anchorage, AK 99501
cynthia.drinkwater@alaska.gov
Telephone:   (907) 269-5200
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Alaska*

Signed May ____ , 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOR THE STATE OF ARIZONA**
By: _____
Nancy V. Anger (AZ Bar # 6810)
Assistant Attorney General
Office of Attorney General Mark Brnovich
1275 West Washington
Phoenix, Arizona 85007-2997
nancy.anger@azag.gov
Telephone:   (602) 542-4686

*Attorney for Plaintiff State of Arizona*
Signed _____, 2015

**FOR THE STATE OF ARKANSAS**

By:

Kevin Wells (AR Bar # 2007213)*
Assistant Attorney General

Office of Attorney General Leslie Rutledge
323 Center Street, Suite 500
Little Rock, Arkansas 72201
kevin.wells@arkansasag.gov

Telephone:    (501) 682-8063

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of Arkansas*

Signed May 8, 2015

**FOR THE STATE OF CALIFORNIA**
By: _____
Sonja K. Berndt (CA Bar #131358)*
Deputy Attorney General
Office of Attorney General Kamala Harris
300 S. Spring St.
Suite #1702
Los Angeles, California 90013
Sonja.berndt@doj.ca.gov
Telephone:   (213) 897-2179
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of California*
Signed _____, 2015

**FOR THE COLORADO SECRETARY OF STATE**

By: _____

LEANN MORRILL (CO Bar #38742)
First Assistant Attorney General
Office of Attorney General Cynthia H. Coffman
Public Officials Unit
1300 Broadway, 6th Floor
Denver, Colorado 80203
Email: leann.morrill@state.co.us
Telephone: (720) 508-6159

*Attorney for Plaintiff Colorado Secretary of State*

Signed _____, 2015


**FOR THE STATE OF COLORADO**

By: _____

ALISSA GARDENSWARTZ (CO Bar# 36126)
First Assistant Attorney General
Office of Attorney General Cynthia H. Coffman
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, Colorado 80203
Email: alissa.gardenswartz@state.co.us
Telephone: (720) 508-6204

*Application for pro hac vice pending

*Attorney for Plaintiff Colorado Attorney General*

Signed _____, 2015

FOR THE STATE OF CONNECTICUT
By: _____
Gary W. Hawes (CT Bar # 415091)*
Assistant Attorney General
Office of Attorney General George Jepsen
55 Elm Street
P.O. Box 120
Hartford, Connecticut 06141-0120
Gary.Hawes@ct.gov
Telephone:    (860) 808-5020
*Application for pro hac vice pending
*Attorney for Plaintiff State of Connecticut*

Signed _____5/7_____, 2015

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR THE STATE OF DELAWARE**

By: _____

Gregory C. Strong (DE Bar # 4664)*
Gillian L. Andrews (DE Bar # 5719)
Deputy Attorneys General

Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, Delaware 19801
gregory.strong@state.de.us

Telephone:   (302) 577-8504

*Application for *pro hac vice* pending

*Attorneys for Plaintiff State of Delaware*

Signed ____**5/14**____, 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOR THE STATE OF FLORIDA**
By:
Rebecca H. Sirkle (FL Bar # 42312)*
Assistant Attorney General
Office of Attorney General Pam Bondi
135 West Central Blvd., Suite 670
Orlando, Florida 32801
Rebecca.Sirkle@myfloridalegal.com
Telephone:   (407) 316-4840
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Florida*
Signed May 5th , 2015

**FOR THE STATE OF GEORGIA**
By: _____
Daniel S. Walsh Georgia Bar # 735040*
Senior Assistant Attorney General

Office of Attorney General Sam Olens
Department of Law
State of Georgia
Atlanta, Georgia 30306
dwalsh@law.ga.gov

Telephone:   (404) 657-2204

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of Georgia and Plaintiff
Secretary of State for the State of Georgia*

Signed May 8, 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOR THE STATE OF HAWAII**

By:    *Jodi L. K. Yi*
     Jodi L. K. Yi    HI Bar #6625*
     Deputy Attorney General

Attorney General Douglas S. Chin
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii 96813
Jodi.K.Yi@Hawaii.gov
Telephone:    (808) 586-1470

*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Hawaii*

Signed April 28, 2015

**FOR THE STATE OF IDAHO**

By:
JANE HOCHBERG (ID Bar # 5465)*
Deputy Attorney General
Office of Attorney General Lawrence G. Wasden
Consumer Protection Division
954 W. Jefferson Street, 2nd Floor
PO Box 83720
Boise, Idaho 83720-0010
jane.hochberg@ag.idaho.gov
Telephone:   (208) 334-3553
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Idaho*
Signed   april 30   , 2015

**FOR THE PEOPLE OF THE STATE OF ILLINOIS**

By: _____

Barry S. Goldberg
Assistant Attorney General (IL Bar # 6269821)*
Assistant Bureau Chief
Charitable Trust Bureau
Office of Illinois Attorney General Lisa Madigan
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
bgoldberg@atg.state.il.us
Telephone Charitable Trust Bureau: (312) 814-2595

Therese Harris, Bureau Chief
Charitable Trust Bureau
Office of Illinois Attorney General Lisa Madigan
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
tharris@atg.state.il.us
Telephone Charitable Trust Bureau: (312) 814-2595

*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Illinois*

Signed April 30, 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOR THE STATE OF INDIANA**

By: _____
Richard M. Bramer (IN Bar # 15989-77)*
Director, Consumer Protection Division
Office of Attorney General Gregory F. Zoeller
302 West Washington Street
IGCS Fifth Floor
Indianapolis, Indiana 46204
richard.bramer@atg.in.gov
Telephone:   (317) 232-1008
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Indiana*
Signed _____, 2015

1
2

**FOR THE STATE OF IOWA**
By:
Steve St. Clair (IA Bar #AT0007441)*

3

Assistant Attorney General

Office of Attorney General Tom Miller

4

Hoover Building, 2nd Floor

5

1305 East Walnut

Des Moines, Iowa 50319

6

steve.stclair@iowa.gov

7

Telephone:   (515) 281-5926

*Application for *pro hac vice* pending

8

*Attorney for Plaintiff State of Iowa*

Signed April 22, 2015

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOR THE STATE OF KANSAS**

By: _Lynette R Bakker_

Lynette R. Bakker (KS Bar # 22104)*
Assistant Attorney General
Office of Attorney General Derek Schmidt
120 S.W. 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
lynette.bakker@ag.ks.gov
Telephone:   (785) 296-3751
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Kansas*
Signed _May 5_, 2015

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR THE COMMONWEALTH OF KENTUCKY**

By: _____

Leah Cooper Boggs (KY Bar # 83471)*
Assistant Attorney General
Office of Attorney General Jack Conway
1024 Capital Center Drive
Suite 200
Frankfort, Kentucky 40601
Leah.boggs@ky.gov
Telephone:   (502) 696-5389
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Kentucky*

Signed _May 8_____, 2015

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR THE STATE OF LOUISIANA**
By: _Cathryn E. Gits_
Cathryn E. Gits (LA Bar #35144)
Assistant Attorney General
Office of Attorney General James D. "Buddy"
      Caldwell
1885 N. Third Street
Baton Rouge, Louisiana 70802
gitsc@ag.state.la.us
Telephone:   (225) 326-6400
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Louisiana*
Signed _May 7_, 2015

**FOR THE STATE OF MAINE**

Janet T. Mills
Maine Attorney General

By: *Carolyn A. Silsby*
Carolyn A. Silsby (ME Bar # 3030)*
Assistant Attorney General
Office of the Maine Attorney General
Burton Cross State Office Building
111 Sewall Street, 6th Floor
Augusta, Maine 04330
Carolyn.silsby@maine.gov
Telephone:   (207) 626-8829
*Application for *pro hac vice* pending
*Attorney for Plaintiff State of Maine*

Signed *April 22* , 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOR THE STATE OF MARYLAND**

By: _C. Beatrice Nuñez-Bellamy_
C. Beatrice Nuñez-Bellamy*
Assistant Attorney General
Office of Attorney General Brian E. Frosh
200 St. Paul Place
Baltimore, MD 21202
bnunezbellamy@oag.state.md.us
Telephone:   (410) 576-6300
*Application for *pro hac vice* pending
Attorney for Plaintiff State of Maryland and
        Secretary of State John Wobensmith
Signed May 14, 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOR THE COMMONWEALTH OF
MASSACHUSETTS**

**MAURA HEALEY, ATTORNEY GENERAL**

By: _____
Brett J. Blank (MA Bar # 686635)*
Assistant Attorney General

Office of Attorney General Maura Healey
One Ashburton Place
Boston, Massachusetts 02108
brett.blank@state.ma.us
Telephone:    (617) 727-2200

*Application for *pro hac vice* pending

*Attorney for Plaintiff Commonwealth of Massachusetts*

Signed May 8, 2015

FOR THE STATE OF MICHIGAN
By: _____
William R. Bloomfield (MI Bar #68515)*
Assistant Attorney General
Office of Attorney General Bill Schuette
Corporate Oversight Division
P.O. Box 30755
Lansing, MI 48909
bloomfieldw@michigan.gov
Telephone:   (517) 373-1160
*Application for pro hac vice pending
Attorney for Plaintiff State of Michigan
Signed _May 4_____, 2015

1   FOR THE STATE OF MINNESOTA
2   By: _Elizabeth Kremenak_
    ELIZABETH KREMENAK (MN Bar # 0390461)*
3   Assistant Attorney General
4   Office of Attorney General Lori Swanson
    445 Minnesota Street, Suite 1200
5   St. Paul, MN  55101-2130
6   elizabeth.kremenak@ag.state.mn.us
    Telephone:   (651) 757-1423
7   *Application for pro hac vice pending
    Attorney for Plaintiff State of Minnesota
8   Signed _May 7_, 2015
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOR THE STATE OF MISSISSIPPI
By: _____
Tanya G. Webber (MS Bar #99405)*
Assistant Secretary of State/Charities Division
Office of Secretary of State Delbert Hosemann
Post Office Box 136
Jackson, Mississippi 39205-0136
Tanya.webber@sos.ms.gov
Telephone:   (601) 359-6742
*Application for pro hac vice pending
Attorney for Plaintiff State of Mississippi
Signed __April 29__, 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOR THE STATE OF MISSOURI**

**CHRIS KOSTER**
Attorney General

ROBERT E. CARLSON, # 54602
Assistant Attorney General

P.O. Box 861
St. Louis, MO 63188
(314) 340-6816
Fax: (314) 340-7957
bob.carlson@ago.mo.gov

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of Missouri*

Signed _May 11_____, 2015

**FOR THE STATE OF MONTANA**


By:  *Kelley L. Hubbard*

TIMOTHY C. FOX
Montana Attorney General
E. EDWIN ECK, MT Bar No. 414*
Deputy Attorney General
KELLEY L. HUBBARD, MT Bar No. 9604*
Assistant Attorney General

Montana Attorney General's Office
P. O. Box 200151
Helena, MT 59620-0151
EdEck@mt.gov
KHubbard@mt.gov

Telephone:    (406) 444-2026

*Application for *pro hac vice* pending

*Attorneys for Plaintiff State of Montana*

Signed May 5, 2015

1

**FOR THE STATE OF NEBRASKA**
By: _____

2

Daniel Russell (NE Bar # 25302)*

3

Assistant Attorney General
Office of Attorney General Douglas J. Peterson

4

2115 State Capitol
PO Box 98920

5

Lincoln, Nebraska 68509

6

daniel.russell@nebraska.gov
Telephone:   (402) 471-1279

7

*Application for pro hac vice pending

8

Attorney for Plaintiff State of Nebraska
Signed _____May  6_____, 2015

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOR THE STATE OF NEVADA

By: *Jo Ann Gibbs*

JOANN GIBBS
NV Bar # 005324
Chief Multistate Counsel
Office of Attorney General Adam Paul Laxalt
10791 W. Twain Avenue, Suite 100
Las Vegas, Nevada  89135
jgibbs@ag.nv.gov
Telephone:   (702) 486-3789
*Application for pro hac vice pending
Attorney for Plaintiff State of Nevada

Signed *April 30*    , 2015

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOR THE STATE OF NEW HAMPSHIRE

By: _____
         Thomas J. Donovan (NH Bar #664)*
         Director of Charitable Trusts
Joseph A. Foster, Attorney General
33 Capitol Street
Concord, NH  03301
tom.donovan@doj.nh.gov
Telephone:   (603) 271-1288
*Application for pro hac vice pending
Attorney for Plaintiff State of New Hampshire
Signed May 8 , 2015

**FOR THE STATE OF NEW JERSEY**

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY

By: _____

Erin M. Greene (NJ Bar #014512010) *
Deputy Attorney General

State of New Jersey
Office of Attorney General
Department of Law and Public Safety
Division of Law
124 Halsey Street - 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
erin.greene@dol.lps.state.nj.us

Telephone: (973) 648-4846

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of New Jersey*

Signed ___MAY 1___, 2015

FOR THE STATE OF NEW MEXICO
By: _____
Elizabeth Korsmo (NM Bar # 8989)*
Assistant Attorney General
Office of Attorney General Hector Balderas
408 Galisteo St.
Santa Fe, New Mexico 87501
ekorsmo@nmag.gov
Telephone:   (505) 827-6000
*Application for pro hac vice pending
Attorney for Plaintiff State of New Mexico
Signed _____ 5 /5 _____, 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOR THE STATE OF NEW YORK

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By: _____
Yael Fuchs (NY Bar # 4542684)*
Assistant Attorney General
Charities Bureau
120 Broadway, 3rd Floor
New York, New York 10271
Telephone:   (212) 416-8401
yael.fuchs@ag.ny.gov

*Application for *pro hac vice* pending
*Attorney for Plaintiff State of New York*

Signed _____May 6_____, 2015

FOR THE STATE OF NORTH CAROLINA
By: _____
Creecy Johnson (NC Bar #32619)*
Special Deputy Attorney General
Office of Attorney General Roy Cooper
9001 Mail Service Center
Raleigh, NC  27699
ccjohnson@ncdoj.gov
Telephone:   (919) 716-6000
*Application for pro hac vice pending
Attorney for Plaintiff State of North Carolina
Signed _____May 7_____, 2015


By: _____
Lareena Y. Phillips (NC Bar #36859)*
Assistant Attorney General
Counsel for North Carolina Secretary of State
    Elaine F. Marshall
9001 Mail Service Center
Raleigh, NC  27699
lphillips@ncdoj.gov
Telephone:   (919) 716-6610
*Application for pro hac vice pending
Attorney for Plaintiff State of North Carolina
Signed _____May 7_____, 2015

**FOR THE STATE OF NORTH DAKOTA**

By: _Michael C. Thompson_

Michael C. Thompson (ND Bar # 06550)*
Assistant Attorney General

Office of Attorney General Wayne Stenehjem
Consumer Protection Division
Gateway Professional Center
1050 E. Interstate Ave Ste 200
Bismarck, ND 58503-5574
mcthompson@nd.gov

Telephone:   (701) 328-5570

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of North Dakota*

Signed April 23, 2015

FOR THE STATE OF OHIO
By: _____
Yvonne Tertel (OH Bar # 0019033)*
Principal Assistant Attorney General
Office of Attorney General Mike DeWine
Charitable Law Section
150 E. Gay St., 23rd floor
Columbus, Ohio 43215
yvonne.tertel@ohioattorneygeneral.gov
Telephone:   (614) 466-3181
*Application for pro hac vice pending
Attorney for Plaintiff State of Ohio
Signed _____May 6_____, 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOR THE STATE OF OKLAHOMA
E. SCOTT PRUITT
OKLAHOMA ATTORNEY GENERAL


_Malisa McPherson_

Malisa McPherson (OK Bar #32070)*
Assistant Attorney General
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
Telephone:  (405) 521-6926
Facsimile:  (405) 522-0085
Malisa.McPherson@oag.ok.gov
*Application for _pro hac vice_ pending
Attorney for Plaintiff State of Oklahoma
Signed May 12, 2015

**FOR THE STATE OF OREGON**

By: _____
Heather L. Weigler, (OR Bar #035900)*
Assistant Attorney General

Office of Attorney General Ellen F. Rosenblum
Oregon Department of Justice
1515 SW 5th Ave., #410
Portland, Oregon 97201
Heather.l.weigler@state.or.us

Telephone:     (971) 673-1910

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of Oregon*

Signed _____May 5_____, 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOR THE COMMONWEALTH OF
PENNSYLVANIA
By: *Michael T. Foerster*
Michael T. Foerster (PA Bar #78766)*
Senior Deputy Attorney General
Office of Attorney General Kathleen Kane
14th Floor
Strawberry Square
Harrisburg, Pennsylvania 17120
mfoerster@attorneygeneral.gov
Telephone:   (717) 783-6084
*Application for pro hac vice pending
Attorney for Plaintiff State of Pennsylvania
Signed *May 13*, 2015

1
2
3
4
5
6
7
8

FOR THE STATE OF RHODE ISLAND
By: _____
Genevieve M. Martin (RI Bar # 3918)*
Assistant Attorney General
Office of Attorney General Peter Kilmartin
150 South Main Street
Providence, Rhode Island 02903
gmartin@riag.ri.gov
Telephone:   (401) 274-4400 x2300
*Application for pro hac vice pending
Attorney for Plaintiff State of Rhode Island
Signed _____5/1_____, 2015

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**FOR THE STATE OF SOUTH CAROLINA**
By:

2

Shannon A. Wiley (SC Bar # 69806)*

3

Deputy General Counsel
Office of Secretary of State Mark Hammond

4

1205 Pendleton St., Suite 525

5

Columbia, South Carolina 29201
swiley@sos.sc.gov

6

Telephone:  (803) 734-0246

7

*Application for pro hac vice pending
Attorney for Plaintiff State of South Carolina

8

Signed ___May 7___, 2015

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOR THE STATE OF SOUTH DAKOTA
By:
Philip D. Carlson (SD Bar # 3913)*
Assistant Attorney General
Office of Attorney General Marty Jackley
1302 E. Highway 14, Ste. 1
Pierre, South Dakota 57501
Phil.Carlson@state.sd.us
Telephone:   (605) 773-3215
*Application for pro hac vice pending
Attorney for Plaintiff State of South Dakota
Signed  *April 29*  , 2015

1

2

3

4

5

6

7

8

FOR THE STATE OF TENNESSEE
By: _Janet M. Kleinfelter_
[Janet M. Kleinfelter] (TN Bar # 13889)*
Deputy Attorney General
Office of Attorney General Herbert H. Slatery III
P.O. Box 20207
Nashville, Tennessee 37202
Janet.kleinfelter@ag.tn.gov
Telephone:   (615) 741-7403
*Application for pro hac vice pending
Attorney for Plaintiff State of Tennessee
Signed _May 5_, 2015

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOR THE STATE OF TEXAS

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General of Texas

JAMES E. DAVIS
Deputy Assistant Attorney General for Civil
Litigation

TOMMY PRUD'HOMME
Chief, Consumer Protection

By: _____
JENNIFER M ROSCETTI (TX Bar No. 24066685)*
Assistant Attorney General
COREY D. KINTZER (TX Bar No. 24046219)
Assistant Attorney General
Office of Attorney General Ken Paxton
300 West 15th Street
Austin, Texas 78701
Jennifer.Roscetti@texasattorneygeneral.gov

Telephone:   512-475-4673
*Application for pro hac vice pending
Attorney for Plaintiff State of Texas
Signed _May 8_____, 2015

FOR THE STATE OF UTAH

By: _____

Jeffrey Buckner (UT Bar 4546)*
Assistant Attorney General
Office of Attorney General Sean Reyes
Commercial Enforcement Division
160 E. 300 South, Fifth Floor
P. O. Box 140872
Salt Lake City, Utah 84114-0872
Jbuckner@utah.gov
Telephone: (801) 366-0105
*Application for pro hac vice pending
Attorney for Plaintiff State of Utah

Signed _May 12_, 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOR THE STATE OF VERMONT**

WILLIAM H. SORRELL
ATTORNEY GENERAL

By: _____
Todd W. Daloz (VT Bar # 4734)*
Assistant Attorney General

Office of Attorney General
109 State St.
Montpelier, Vermont 05609
Todd.Daloz@state.vt.us

Telephone:   (802) 828-4605

*Application for *pro hac vice* pending

*Attorney for Plaintiff State of Vermont*

Signed ___May 8th___, 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOR THE COMMONWEALTH OF VIRGINIA

By: _____
Richard S. Schweiker, Jr. (VA Bar # 34258)*
Senior Assistant Attorney General
Office of Attorney General Mark R. Herring
Consumer Protection Section
900 East Main Street
Richmond, Virginia 23219
rschweiker@oag.state.va.us
Telephone:   (804) 786-5643
*Application for pro hac vice pending
Attorney for Plaintiff State of Virginia
Signed _April 27_, 2015

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOR THE STATE OF WASHINGTON
By:
Sarah Shifley (WA Bar # 39394)*
Assistant Attorney General
Office of Attorney General Bob Ferguson
800 Fifth Ave, Ste. 2000
Seattle, WA 98104
sarah.shifley@atg.wa.gov
Telephone:    (206) 389-3974
*Application for pro hac vice pending
Attorney for Plaintiff State of Washington
Signed  April 27 , 2015

1   FOR THE STATE OF WEST VIRGINIA
2   By: _____
    Michael M. Morrison (WV Bar # 9822)*
3   Assistant Attorney General
    Office of Attorney General Patrick Morrisey
4   812 Quarrier Street, 1st Floor
    Charleston, West Virginia 25301
5   P.O. Box 1789
6   Charleston, West Virginia 25326
    Matt.M.Morrison@wvago.gov
7   Telephone:   (304) 558-8986
8   *Application for pro hac vice pending
    Attorney for Plaintiff State of West Virginia
9   Signed _____, 2015
10
    By: _____
11  Laurel K. Lackey (WV Bar # 10267)*
    Assistant Attorney General
12  Counsel for Secretary of State Natalie E. Tennant
13  Office of Attorney General Patrick Morrisey
    269 Aikens Center
14  Martinsburg, West Virginia 25404
15  Laurel.K.Lackey@wvago.gov
    Telephone:   (304) 267-0239
16  *Application for pro hac vice pending
17  Attorney for Plaintiff State of West Virginia
    Signed _April 30_, 2015
18
19
20
21
22
23
24
25
26
27
28

FOR THE STATE OF WISCONSIN

BRAD D. SCHIMEL
ATTORNEY GENERAL

By: _Francis X. Sullivan_
Francis X. Sullivan
Assistant Attorney General
Wisconsin State Bar no. 1030932*

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-2222
(608) 267-8906 (Fax)
sullivanfx@doj.state.wi.us

*Application for pro hac vice pending

Attorney for Plaintiff State of Wisconsin

Signed _May 4_, 2015

FOR THE STATE OF WYOMING


By: _____
Clyde W. Hutchins (WY Bar # 6-3549)*
Senior Assistant Attorney General
Office of Attorney General Peter K. Michael
123 State Capitol
Cheyenne, WY 82002
clyde.hutchins@wyo.gov
Telephone:   (307) 777-7847
*Application for pro hac vice pending
Attorney for Plaintiff State of Wyoming
Signed May 8, 2015

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOR THE DISTRICT OF COLUMBIA**

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Acting Deputy Attorney General
Public Interest Division

BENNETT RUSHKOFF
Chief, Public Advocacy Section

By: _____
BRIAN R. CALDWELL (DC Bar # 979680)*
Assistant Attorney General
Office of Attorney General Karl A. Racine
441 Fourth Street, N.W., Suite # 650-S
Washington, D.C. 20001
brian.caldwell@dc.gov
Telephone:   (202) 727-6211

*Application for pro hac vice pending

*Attorney for Plaintiff District of Columbia*

Signed:  May 7, 2015